SANFORD v. BENNETT.

The statute (ch. 130 of 1854) exempting from prosecution for libel the publishers of legislative debates, &c., is prospective only and is no defence for a publication prior to its enactment.

The publication of a slander uttered by a murderer at the time of his execution, is not privileged either under that statute or at the common law.

The statute relates only to statements made in judicial, legislative or administrative bodies in execution of some public duty.

APPEAL from the Supreme Court. The action was for publishing alleged libelous matter, affecting the professional character of the plaintiff as a counsellor at law, in the defendant's

paper, The New York Herald, as part of the speech made by Warren Wood, just previous to his execution pursuant to a conviction for murder, in Greene county, on the 20th day of January, 1854. An account of the execution, with the speech of the convict, was first published in the Greene county Whig, at Catskill, on the 21st January. This was copied into the defendant's paper on the 25th January, preceded by a statement showing that it was taken from the Catskill paper. It was selected for publication by a person in the employment of the defendant without his personal agency or knowledge. It was proved as a fact on the trial of this case, that Mr. Tremain was associated with the plaintiff as counsel for the prisoner on his trial, but that the imputations of improper conduct on the part of the plaintiff were untrue in fact. The portion of the speech commented upon as libelous was as follows: "I placed entire confidence in him" [the plaintiff], "and left my case wholly to him. And what did he do? He discharged my witnesses without the knowledge of myself or Mr. Tremain. Tremain said it was wrong and ought not to have been done. He did not do as he agreed to" [here he commented harshly upon the conduct of Mr Sanford]. "Gentlemen, I feel it my duty to tell you these things. I may go too far, but I hope not; and I trust you will excuse me. I have no hard feelings against any man, but I feel it my duty to warn you all. If you ever employ Mr. Sanford" [here he again commented harshly]. "He pleaded well and did well with what he had; but he sent important witnesses away, and that is why I blame him."

The case was tried before James R. Whiting, as a referee, who found the defendant guilty, and assessed the damages at $250. The defendant insisted, at the trial, upon the several points discussed in the following opinion; and he appealed here from the judgment of affirmance of the general term.

*D. D. Field*, for the appellant, insisted that the publication was privileged by force of the act of 1854, chapter 130; or, if

that act did not apply, that it was a privileged publication by the rules of the common law.

*Lyman Tremain,* for the respondent.

DENIO, J.   It being impossible to deny the libelous character of the publication, or to maintain that the defendant was exempt from responsibility on account of the article having been copied from another newspaper, though it was stated to have been so copied, the only question is whether it was what is termed a privileged publication.   I am of opinion that the statute which is relied on has no application to the case; for the reason, in the first place, that the publication was made before the enactment of the law, and that its provisions are not retrospective.   The act was passed on the 1st day of April, 1854, more than two months after the publication complained of, and took effect immediately upon its passage.   It declares that no reporter, editor or proprietor of any newspaper shall be liable to any action or prosecution, civil or criminal, for a fair and true report in such newspaper, of certain proceedings therein referred to.   This is the ordinary language employed where a new rule is intended to be established for future cases.   To render it in terms applicable to publications theretofore made, it should have read that the party should be exempt from liability for such reports already made, as well as for such as should be made in future.   The general rule is that the character and consequences of particular acts are to be determined by the law which was in force when the acts were done; and though it may be in the power of the legislature to declare that a given class of libelous publications already made shall not thereafter be prosecuted—for such an act would not impair rights of property actually vested — still, as such legislation is very unusual and would, in most cases, be highly objectionable, the judges should require very plain and unequivocal language before determining to give a statute such a retroactive effect.   The words, no reporter, &c., shall be liable—for a fair and true report, — according to

Sanford *v.* Bennett.

their natural and grammatical meaning, refer to a future report as well as a future liability, and do not, therefore, as I think, admit of the construction attempted to be placed upon them. But if they were equivocal we ought, upon well settled principles of interpretation, so to construe them that the change in the law, if the statute really effects a change, shall operate prospectively only. *Dash* v. *Van Kleeck* (7 Johns., 477), is the leading case upon this subject. It appears that at the common law, if a prisoner was committed to jail upon final process for debt, and escaped, yet if he voluntarily returned before action brought against the sheriff for the escape, such return might be pleaded in bar, and furnished a defence. The statute authorizing the sheriff to admit prisoners to the jail liberties on giving bail not to depart from them, was held by the courts to have so changed the law, as that, after the passage of that act, a voluntary return, even before suit brought, would not exonerate the sheriff from liability for the escape. This was the state of the law when the escape took place, for which Dash, the creditor, sued Van Kleeck, the sheriff. But pending that action the legislature passed a statute declaring that nothing contained in the act concerning jail liberties should be so construed as to prevent any sheriff, in case of escapes, from availing himself, as at common law, of a defence arising from a voluntary return of the prisoner before an action should be commenced for the escape. The defendant attempted to avail himself of the statute by showing that the prisoner, for whose escape he was sued, had returned to custody before the bringing of the action; and the question was thus presented whether the statute should be construed retrospectively so as to affect prior escapes and voluntary returns, or prospectively only. And it was held, notwithstanding the strength of the language used, that it could not be so construed as to embrace cases happening anterior to its passage. It was laid down as a principle of universal jurisprudence, that all laws are to be construed as furnishing a rule for future cases only, unless they contain language unequivocally and certainly embracing past transactions. The opinions of Chief Justice

KENT and Mr. Justice THOMPSON examine all the prior authorities, and contain the general reasoning upon which the doctrine stands, and the case has always been considered as establishing that doctrine upon a firm foundation. (*Butler* v. *Palmer*, 1 Hill, 324; *The People* v. *Carnal*, 2 Seld., 463; *Wood* v. *Oakley*, 11 Paige, 400; *Ely* v. *Holton*, 15 N. Y., 595.)

But I am of the opinion that the case would not fall within the provisions of the statute if it had been in force at the time of the publication complained of. A publication, to be privileged within the terms of the statute, must be "a fair and true report in such newspaper of some judicial, legislative or other public, official proceedings," or of "some statement, speech, argument or debate in the course of the same." It is declared in another section that the enactment is not to be "so construed as to protect any such editor, reporter or proprietor from an action or indictment for any libelous comments or remarks superadded to or interspersed or connected with such report." The execution of a capital sentence upon a convict is no doubt a public proceeding of a very solemn and impressive character, but it is not one which necessarily admits of any speech, argument or debate, or of any statement of fact except the simple announcement of the authority under which the act is done. Other things may be said at the time by the public officers, the ministers of religion, who may be in attendance, by the bystanders, and by the convict himself; but these are no necessary part of the public proceedings. They are not required by the law, and they cannot in any way influence the act about to be performed. It is quite usual for the convict to make a statement or speech either by way of confession, or in vindication of himself as the case may be; and it is also customary for the attending clergyman to conduct the devotions in a public and audible manner. But these are simply incidental to the public proceeding, and not a portion of it: whether they take place or are omitted is of no legal consequence. Suppose, for instance, that the minister should make his prayer the vehicle for injurious reflections upon the prosecutor, or his witnesses, and the imputation should be of such a character as to support an

Sanford *v.* Bennett.

action for verbal slander, no one, I presume, would contend that the words would be privileged, or that, if printed, the publisher of them would be exempt from a prosecution for libel. And yet they would constitute a statement made in the course of a public proceeding, in the same sense as the dying speech of the culprit. Both are customary and usual concomitants of a capital execution, but neither of them have, in my judgment, any such connection with it as to be within the purview of the act under consideration. The second section of the statute confirms this view of its intention. It declares that no libelous matter interspersed or connected with the report is within the privilege. This probably refers, primarily, to observations which might be added by the reporter, editor or other person concerned in the publication; but it would be equally within the language and spirit of the exception if made by another person at the time and place of the public proceedings, though it were not a portion of it, and were published with the actual proceedings. The common law had declared that the statements, speeches, &c., referred to in the statute, should be privileged, so that the persons whose duty or right it was to participate in such public discussions, might be perfectly free in the exercise of these rights and duties, and not under the restraint which it was supposed might embarrass them if they were liable to be called to account; but it was not so clear that everything which might lawfully be spoken or introduced in writing into public proceedings, could be safely printed and published afterwards. The Superior Court of the city of New York had in 1850 and 1851, decided, in conformity with the current of English authority, that the publication of *ex parte* proceedings before a public magistrate, such as a complaint against an individual for a criminal offence, was not privileged. (*Stanley* v. *Webb*, 4 Sandf. S. C. R., 21; *Mathews* v. *Beach*, 5 Id., 256.) And it is well known that actions for libel had been sustained for publishing legislative documents printed pursuant to an order of the House of Commons. (*Stockdale* v. *Hansard*, 9 Adolph. & Ellis, 7.)

The act was not intended to enlarge the class of privileged communications when originally made in courts and before public bodies. They were all embraced by the rules of the common law; and it was only the repetition of them by printing and publishing in public journals which was thought to be improperly restricted. To remedy this was the whole purpose of the statute; and it would extend its operation beyond its intention and beyond the public motives upon which we may presume that it was enacted to hold that it authorized the publication of matters which it was actionable to utter in the first instance.

The words of the statute, I think, show that it was not intended to have any reference to such a transaction as the execution of a criminal condemned to death. Some of the language, if read alone, is no doubt broad enough to embrace it. It is in one sense a public official proceeding; but so, in the same sense, is the leading to prison of, or locking the door upon, a culprit adjudged to confinement, by the initiatory or final process in a criminal case, or his discharge, and many other things connected with the public administration of the law, or of public affairs. It would scarcely answer to hold that the publication of everything which might be said on such an occasion, though by one of the actors in the proceeding, and though suggested by the bearing of the transaction upon him, would be privileged, however false it might be, and however injuriously it might reflect upon an absent person. I am persuaded that the transactions embraced in the purview of the statute are such as resemble judicial and legislative proceedings, such as the transactions of administrative boards in which the subjects dealt with are liable to be considered, deliberated upon, discussed and determined. It is to such proceedings only that the words statement, speech, argument or debate, used in the act can be sensibly applied. To apply them to an executive act to be performed by a single official person, and which admits of no debate or deliberation, would be a perversion of the scope and intention of this act. The maxim of construction expressed

by the terms *nosciter a sociis*, seems to me to bear strongly upon the case.

Much which has already been said bears upon the position taken by the counsel for the defendant, that the publication was privileged by the common law. The statute was undoubtedly intended to embrace all these cases in which it was thought proper to protect publications connected with public proceedings. The want of legal connection between the words spoken, and the proceeding which was going forward at the same time and place, which has led me to the conclusion that the statute does not apply, shows that it is not within the reason upon which the common law rule is based. That rule assumes that the public may have a legitimate interest in being made acquainted with the proceedings of courts of justice and of legislative bodies. The free circulation of such intelligence is of vast advantage in every country, and particularly here, where all reforms in legal or administrative polity must proceed from the people at large. But neither the reason of the rule, nor, as I believe, the rule itself has any application to a proceeding in which, neither forensic debate, nor legislative or administrative deliberation or determination have any place. Where the proceeding is a mere act, with which neither oral nor written communications have anything more than an accidental or fortuitous connection, there is no room for the application of the doctrine of privilege to whatever may be spoken or written at the time and place, when and where it is transpiring. Such transactions are subject to be reported, described and published in newspapers or otherwise, like other affairs in which individuals and communities feel a curiosity, and with the same liability attaching to the publisher to answer for any injury which may happen to the character of individuals if in the course of such publications libelous imputations are applied to any one. It is, of course, perfectly lawful to publish all the circumstances attending a public execution, including the dying speech of the malefactor; but it is a necessary condition of that right that if scandalous imputations are used by the culprit or any one else which are untrue, he who pub-

lishes them afterwards must be responsible for the wrong and injury thereby occasioned to the person attacked. This determination will not unreasonably abridge the privileges of the conductors of public journals. They are left free to spread before the public all the revolting details of those unseemly transactions, as their taste or sense of propriety may dictate, subject only to the condition that they shall strike out all false and scandalous imputations upon others, or answer in damages to the party injured if they do not. If it should be said that the haste with which they are obliged to publish, leaves them no time to inquire as to the facts, it is not exacting too much to require them to postpone the publication of the libelous portions of the account until a proper investigation into their truth can be made.

I am in favor of affirming the judgment of the Supreme Court.

MASON, J., delivered an opinion to the same effect. He laid some stress upon the provisions of law requiring capital executions to be within the walls of the prison, or an adjoining enclosure, and excluding all spectators, with limited exceptions, as indicating a legislative policy adverse to the publicity of what passes on such occasions. All the judges concurring, except SELDEN, J., who was not present at the determination.

Judgment affirmed.