## IMPEACHMENT OF VERDICT BY JURORS.

THE TERRITORY OF DAKOTA,
            v.
MARIS TAYLOR AND JAMES TAYLOR.

Indictment for libel. Motion for a new trial.

Messrs. *Spink* and *Wheeler*, attorneys for the motion.

Messrs. *Faulk, Gamble* and *West*, contra.

### OPINION BY SHANNON, J.

The jury rendered a verdict of guilty on the 24th of December last, and on the same day the defendants' counsel gave

oral notice of a motion for a new trial, specifying the alleged error in the charge, afterwards embodied in the written motion, which was filed January 12th, 1878. Besides this alleged error in law, the written motion contains two other reasons: First, that "after the jury had retired to deliberate upon their verdict, and while they were so deliberating, they read and examined the Statutes of Dakota, and other works of law on the subject of libel," and secondly, that " after the jury had retired to deliberate upon their verdict, and were so deliberating, one of the bailiffs, to-wit: Warren Osborne, was present in the room with said jury, and talked with them." This last point was, however, formally withdrawn by defendants' counsel, as per writing on file, leaving only the two other specifications as the grounds.

When the motion came on for hearing, counsel for defendants, to support the allegation of irregularity, or misconduct of the jury in examining the Statutes and other works of law, offered in evidence the affidavits of J. C. English and Wm. H. Dale, two of the jurors, sworn to on the 9th and 10th of January, and filed on the 12th.

Counsel on the other side objected to the reception of such evidence, on the ground that the affidavits of jurors cannot legally be introduced to impeach, or set aside their verdict.

The main stress of the very able arguments on both sides was applied to this point, and as no precedent has as yet been established in this territory, the grave importance of the question must be my excuse for the time and labor bestowed upon its consideration.

Under this head, the first inquiry is, as to the competency of a juror to testify to the misconduct of himself or of his fellows. On this subject, Wharton on Cr. Law, 7th ed., § 3328, states that "though the former practice was different, it is now settled in England that a juror is inadmissible to impeach the verdict of his fellows. 'It would open each juror' declared Mansfield, C. J., ' to great temptation, and would unsettle every verdict in which there could be found upon the jury a man who could be induced to throw discredit on their common deliberations.' " And further says Mr. Wharton: " In this country the English rule has generally been adopted, though the affidavits of jurors will be entertained for the purpose of explaining, correcting or enforcing their verdict."

In 1 Greenleaf on Evidence (13th edition) § 252, a, it is said that "on similar grounds of public policy, and for the protection of parties against fraud, the law excludes the testimony of *traverse jurors*, when offered to prove misbehavior in the jury in regard to the verdict. Formerly, indeed, the affidavits of jurors have been admitted in support of motions to set aside verdicts by reason of misconduct, but that practice was broken in upon by Lord Mansfield, and the settled course now is to reject them, because of the mischiefs which may result if the verdict is thus placed in the power of a single juryman."

In 3d Wait's New York Practice, p. 187-8, it is also stated that "on motion to set aside the verdict of a jury for misconduct, the evidence must be derived from the affidavits of persons other than the jurors, for while the affidavit of a juror may be received in support of his verdict, it will not be received to impeach it." Quoting *Green v. Bliss*, 12 How., 428; *Clum v. Smith*, 5 Hill, 560; *Dana v. Tucker*, 4 Johns., 489.

In 3d Estee's Pleadings, page 587, under the head of "Impeaching Verdict," on the ground of misconduct, it is asserted that the affidavits of jurors are not admissible to impeach their verdict for irregularity or misconduct of themselves or their fellows. Quoting, apart from California cases, the following: *Reins v. People*, 30 Ills., 256; *Hughes v. Lister*, 23 Ind., 396.

In Tillinghast & Shearman's Practice, vol. 2, p. 563, it is said that "the affidavits of jurors are not admissible in evidence to show that they were guilty of misconduct during the trial or consultation." But they are admissible to prove an attempt on the part of a successful party to tamper with the jury, as also in support of the verdict.

In Troubat & Haly's Penn. Practice, vol. 1, p. 532, the English rule is stated, and it is said that "the courts of this country incline to the same result;" quoting numerous authorities. And in Lewis' Criminal Law, page 407, the late Chief Justice Lewis, of Pennsylvania, reviewing the authorities, asserts that "there seems at this day but one opinion upon the subject, and that opinion is decidedly adverse to receiving evidence from such a source. In Pennsylvania, it will be found that the weight of authority is against receiving the testimony of jurors to impeach their verdict." In *Cluggage v. Swan*, 4 Binn.

Penn., 157, Yeates, J., delivered a very able opinion in opposition to receiving the affidavits of jurors to invalidate their verdicts. This opinion is highly commended by the reporter in 1 Coxe's Rep., 32, and is cited by Chancellor Kent, with approbation, in 2 John. Chan. Cas., 349

In 1 Archibold, 668, Mr. Waterman, in his notes, declares that "it is now well settled in England, and with a few exceptions, in the United States, that such affidavits cannot be received.

In Graham & Waterman on New Trials, vol. 3, p. 1428, the following reasons are given why affidavits of jurors to impeach their verdict should not be received: 1st. Because they would tend to defeat their own solemn acts under oath; 2d, Because their admission would open a door to tamper with jurymen after they had given their verdict; 3d, Because they would be the means, in the hands of a dissatisfied juror to destroy a verdict at any time after he had assented to it.

In Nash's Pleading and Practice, vol. 2, page 1042, the following language is used: "The affidavits of jurors may be received to impeach the conduct of other persons, like a party; but not to show misconduct on their own part, or that of their fellow jurors. Nor will the affidavit of third persons, as to what they heard jurors say after being discharged, be admitted."

In Wisconsin, in a case in which Dixon, C. J., gave the opinion of the Supreme Court in 1864, it was held that "the affidavits of jurors to their own misconduct cannot be received for the purpose of impeaching their verdict." Quoting 1 Gra. & Wat. on New Trials, 111, and cases cited. See *Edmister v. Garrison*, 18 Wis., 632; also *Shaw v. Fisk*, 21 Wis., 369.

The Supreme Court of Minnesota, in three cases, has excluded such affidavit. (*St. Martin v. Desnoyer*, 1 Minn., 159; *Knowlton v. McMahon*, 13 Minn., 386; *The State v. Stokely*, 16 Minn.; 282.)

In *The State v. Underwood*, 57 Mo., 40, (1874), it is held that "the rule is perfectly settled, that jurors speak through their verdict, and they cannot be allowed to violate the secrets of the jury room and tell of any partiality or misconduct that transpired there, nor speak of the motives which induced or operated to produce the verdict. But they may testify in support of their verdict," etc.

This question was elaborately considered, and the leading authorities collated and reviewed in *Woodward v. Leavitt*, 107 Mass., 453, and the doctrine was declared to be as above stated.

In Vermont the rule is that "the affidavit of a juror shall not be received to prove what passed during the investigation of the cause in the jury room." This rule has been applied there to exclude proof of statements of facts made by jurors to their fellows. (*Robbins v. Windover*, 2 Tyler's Rep., 11.) It has also been applied there to exclude evidence of a mistake in point of law, the court in the latter case declaring that the oftener it is argued they are more confirmed in the correctness of former decisions that the affidavits of jurors cannot be read to "disclose the deliberations of the jury room." (*Harris v. Huntingdon*, 2 Tyler, 147.)

In *The State v. Freeman*, 5 Conn., 348, it was held that "a juror is an inadmissible witness to prove the misconduct of his fellow-jurors, for the purpose of impeaching their verdict," Hosmer, C. J., saying that "the opinion of almost the whole legal world is adverse to the reception of the testimony in question, and, in my opinion, on invincible foundations. (See, also, *Meade v. Smith*, 13 Conn., 346.)

The Supreme Court of Texas, in 1865, in *Johnson v. The State*, for murder, 27 Tex. R., p. 769, rejected the affidavit of three of the jurymen, saying that "no case has yet occurred in which such affidavits have been tolerated in the courts of this State for the purpose of impeaching a verdict. And when we consider the wide door which would thereby be opened for improper practices, we would hesitate long, and feel ourselves constrained by imperative necessity for accomplishing the ends of justice, before we could give our sanction to such a practice. Although a few isolated cases may be found in which such affidavits have been received, the better practice seems to have been established in most if not all the States except Tennessee. The question has been before this court heretofore, on more than one occasion, and it has been uniformly decided adversely to the appellant."

So, too, with the Supreme Court of New Jersey, (1872) in *Hutchinson v. Oil Co.*, 7 Vroom, 24, in which that court held that "although there are many cases to the contrary, the great weight of authority in this country and in England appears

to support the doctrine that the testimony of jurors to impeach their own verdicts should be excluded, on grounds of public policy."

So likewise, the Supreme Court of Oregon, in 3d Or. Rep., 180, used the following language: "The affidavit of the juror is inadmissible to impeach the verdict, or even to show a mistake in making up the verdict. Nor can it be received to show what passed in the jury room."

In *The State v. Stewart*, 9 Nevada, 121, (1874) there was a conviction of the crime of murder in the first degree, and in support of the motion for a new trial, the affidavit of one Collins, a juror, was presented. Hawley, J., in pronouncing the opinion of the court, said: "The affidavit of Collins presents no question worthy of consideration. No juror should ever be allowed to impeach the verdict of the jury by testifying to his *own misconduct*, or by asserting his ignorance of the law. These principles are now too well settled to require discussion, or citation of authorities."

In Indiana, according to Bicknell's Criminal Practice (edition of 1866), such affidavits are excluded by that Supreme Court. "It must be remembered," says that writer, page 238, "that the misconduct of the jury cannot be shown by the affidavit of a juryman, 15 Ind., 347; 14 Ind., 450; 11 Ind., 368; and no statement of a juryman, verbal or written, can be received to prove such misconduct. (10 Ind., 368.) But misconduct of the jury may be shown by the affidavit of their bailiff. (8 Bld., 32.")

So in Illinois, in *Martin v. Ehrenfels*, 24 Ills., 187, it was held that the affidavit of a juror is not to be received to impeach the conduct of the panel. Said Caton, C. J., "we will first consider the affidavits of the jurors. The only tendency of these affidavits is to impeach the conduct of the jury. For this purpose the affidavit of a juror cannot be received." See, also, *Allison v. The People*, 45 Illinois R., 37.

The same Supreme Court, in 1871, in *City of Chicago v. Dermody*, 61 Ills., 431, held that "it is the well settled practice that, whilst the court will never receive affidavits of jurors to impeach their verdict, affidavits of jurors will be received to support their finding, when attacked."

In *Reaves v. Moody*, 15 Richardson, S. Car. Rep., 312, the question was as to the admissibility of an affidavit by four

of the jurymen, made three weeks after the trial, impeaching the verdict. The affidavit was rejected. In that opinion the Chief Justice said, "the precise point was adjudicated more than half a century ago. But the whole subject is elaborately discussed and the authorities reviewed in *Smith v. Culbertson*, 9 Rich., 108. It is difficult to add anything to what is there stated against the admissibility of such affidavits."

In Rhode Island, a new trial will not be allowed on jurors' affidavits, impeaching the verdict. (*Handy v. Prof. Ins. Co.*, 1 R. I., 400; *Tucker v. South Kingstown*, 5 R. I., 558.)

In Virginia, in Thompson's case, 8 Gratt., 641, 650, Thompson J., in delivering the opinion of the court, admitted the well settled English rule, and the great preponderance of American authority in the same way; and he quoted the strong language of Hosmer, C. J., in 5 Conn. R., 348.

In Bull's case, 14 Gratt., 613, 632, most of the authorities, English and American, including those of Virginia, on this subject, were referred to, and the Supreme Court of Appeals concluded that, "in view of all the authorities, and of the reason on which they are founded, we think, as a general rule, the testimony of jurors ought not to be received to impeach their verdict, *especially on the ground of misconduct*." See, also, *Read v. Commonwealth*. 22 Grattan, 924, decided in 1872; 1 Green Cr. Law Rep., 267.

In *Cook v. Castner*, 9 Cush., 266, Chief Justice Shaw, in delivering judgment, said: "We think the Judge was right in rejecting evidence of the alleged partiality and misconduct of a juror in the jury room by the testimony of the juror himself or of the other jurors. It is a rule founded upon obvious considerations of public policy, and it is important that it should be adhered to, and not broken in upon to afford relief in supposed hard cases." See, also, 97 Mass., 382.

And in *Underhill v. Van Cortland*, 2 Johns. Ch. cases, 348, 349, Chancellor Kent said as follows: "He is called as a witness to impeach his own award and his own integrity; and this case falls within the reason and policy of the rule of law that the affidavit of a juror is not to be received to impeach his verdict because it would expose jurors to dangerous practices, and to be tampered with by the losing party."

But as the main principles and features of our Codes are derived from New York sources, it will be pertinent to look more particularly into the decisions in that State. In *The People v. Carnal*, 1 Parker's Cr. Rep., 256, where there was a conviction of murder, it was held that " on a motion for a new trial on the ground of improper conduct of the jury, the affidavits of the jurors are not admissible to prove such improper conduct."

In *The People v. Hartung*, 17 How. Pr. Rep., 87, it is said that " no rule of law is better settled than that the evidence of jurors is not to be allowed for the purpose of impeaching or in any way impairing the effect of the verdict. The doctrine has long been established in England. It has been maintained with singular steadiness and unanimity in the United States, with the exception of Tennessee, where, following an early precedent, its courts have somewhat modified the rule."

In *Wilson v. The People*, 4 Park. Cr. Rep., 619, there was also a conviction of murder and a motion for a new trial. It was held that affidavits of jurors cannot be received to show that, at the request of one of their number, a constable handed in a paper on which were marked the several punishments fixed by law for the different degrees of manslaughter. The Court said that " the act was unquestionably an irregularity. It was an attempt to do what a jury has no legal right to do—to render a verdict based on the punishment, not on the truth." But the court, Gould, J., remarked as to the rule that jurors are not allowed to make affidavits to impeach their own verdicts, as follows: "And I know of no sounder rule of the law. Any other rule would permit a juror, whose conscience, bound by his oath, would not allow him to refuse his assent to a verdict, to commit or procure an irregularity that would, on his own affidavit thereof, avoid the verdict. It would open the door for such mischiefs as could not be endured."

The modern decisions in New York are not less emphatic. In *Dalrymple v. Williams et al.*, 63 N. Y. Rep., 363, (in 1875) Allen, J., in delivering the opinion, says: " There are reasons of public policy why jurors should not be heard to impeach their verdicts, whether by showing their mistakes or

their misconduct." "But the rule is well established, and at this day rests upon well understood reasons of public policy as connected with the administration of justice, that the court will not receive the affidavits of jurymen to prove *misconduct* on their part, or any act done by them which could tend to impeach or overthrow their verdict. This rule excludes affidavits to show mistake or error of the jurors in respect to the merits, or irregularity or misconduct, or that they mistook the effect of their verdict, and intended something different." See, also, to same purport, *Williams v. Montgomery*, 60 N. Y., 648.

The decisions of the Supreme Court of California are also justly considered in this Territory as of leading importance, because of the similarity of the Codes of that State to our own Codes. In *People v. Baker*, 1 Cal., 406, it was held in a trial for murder, that it is a settled rule, founded upon considerations of public policy, that the testimony of a juryman cannot be received to defeat his own verdict.

In *Armsby v. Dickhouse*, 4 Cal., 103, the same rule was declared, and Murray, C. J., said: "The court below erred in setting aside the verdict of the jury and granting a new trial upon the affidavit of a juror of his own and his fellow juror's misconduct."

The same doctrine is reiterated in *Castro v. Gill*, 5 Cal., 40, and in *Wilson v. Berryman*, 5 ibid 45.

In *People v. Wyman*, 15 Cal., 70, (a case of manslaughter) it was held that a verdict cannot be impeached by an affidavit of a juror, tending to show that it was not a fair expression of the opinion of the jury.

The above rule was, however, changed by statute, passed March 5th, 1862, so far as to permit verdicts found "by a resort to chance," to be impeached by the affidavits of jurors. Their practice act, in relation to "new trials," section 193, subdivision 2, was amended so as to read as follows: "Misconduct of the jury:—And whenever any one or more of the jurors have been induced to assent to any general or special verdict, or to a finding on any question submitted to them by the court, by a resort to the determination of chance, such misconduct may be proved by the affidavit of any one of the jurors. See *Donner v. Palmer*, 23 Cal., 47; also, Cal. Code of Civil Proc., (1872) § 657, (§ 193) page 170.

It is here noteworthy that our Code of Civ. Proc., § 286, sub. 2, is in precise agreement with the above provision in California.

The case of *Turner v. Tuolumne Co.*, 25 Cal., 398, is highly interesting because whilst it upholds the common law doctrine that such affidavits cannot be received to impeach but to support the verdict, it places a construction upon the amendment of 1862 as to what constitutes "a resort to chance." To the same effect is *Boyce v. The Cal. Stage Co.*, 25 Cal., 460–475, in which the old rule is reasserted, subject only to the legislative exception. The opinion of Sanderson, Ch. J., on pages 475-6-7-8, is worthy of attention.

*The People v. Hughes* (a case of arson), 29 Cal., 258, sustains the previous adjudications; as, also, does *Hoare v. Hindley*, 49 Cal., 275.

But a very pertinent case is *People v. Doyell*, 48 Cal., 85, an indictment for murder. The defendant moved for a new trial, and in support thereof, filed the affidavit of Frank Johnson, one of the jurors, stating, that while the jury were deliberating, defendant's character was being discussed, and that H. R. Perry, one of the jurors, stated that defendant was, to his knowledge, a quarrelsome man, and that he was at one time on a drunk at Downieville, and had his arms taken away from him. The affidavit also stated that W. E. Corbett, another of the jurors, left the jury room through a window, and remained absent eight or ten minutes unattended by the sheriff; and that the jury had with them the Penal Code, and read portions thereof relating to murder in the first and second degrees, and to manslaughter. The prosecution filed affidavits of Thomas Steel, a juror, and said Corbett, contradicting Johnson as to Corbett having left the jury room. The court below denied a new trial; and the Supreme Court, as to the affidavit of the juror, Johnson, alleging the aforesaid misconduct, held that " a juror is not disqualified to become a witness in a proper case. But public policy prohibits a juryman from impeaching his own verdict by affidavit."

Counsel for the defendants, apart from Tennessee cases, mainly relied upon *Wright v. The Ills. Tel. Co.*, 20 Iowa, 195, decided in 1866, and subsequent cases in that State; upon *Perry v. Bailey*, 12 Kansas R., 539, (1874) and on *Farror v. The State*, 2 Ohio St., 54, Newkirk's case in 27th Indiana, and *U. S. v. Reid*, 12 How., 361.

In Iowa, the earlier cases assert the doctrine as heretofore stated, although by the Code of 1851 it was provided that in applications for new trials the affidavits of jurors may be taken and used in relation to such application. *Cook et al v. Sypher*, 3rd Iowa, 484. In the Revision of 1860, that section of their Code was omitted ; but it, and the decisions upon it, seem to have brought about the Iowa doctrine announced in *Wright v. Ill. Co.*, in the 20th Iowa Reports. That modified rule is " that affidavits of jurors may be received for the purpose of avoiding a verdict,—to show any matter occurring during the trial, or in the jury-room, which does not essentially inhere in the verdict itself; but that such affidavits to avoid the verdict, may not be received to show any matter which does essentially inhere in the verdict itself." See also *Fuller v. R. R. Co.*, 31 Iowa, 211 ; *Cowles v. R. R. Co.*, 32 Iowa, 515. *Perry v. Bailey*, 12 Kansas, follows and adopts this doctrine. But it is worthy of mention that the case of *Grinnell v. Phillips*, 1 Mass., 530, quoted in the 20th Iowa and 12th Kansas, has been overruled by a series of later decisions in Massachusetts.

In Ohio it has been held that where there is evidence *aliunde* of misconduct of the jury, their own testimony may be received, not only to limit and explain, but also to enlarge and aggravate such misconduct. *Farrar v. The State*, 2 Ohio St., 54.

I am aware, also, that Wharton, in commenting on the rule, expresses his views as to a modification " from necessity and when gross injustice has been wrought ; " but to support this view, in the cases quoted by him, his chief reliance seems to be upon the leading Iowa case, *supra*.

It is important to note, that, in the case in the 27th Indiana Reports, the misconduct, or irregularity, was not attempted to be shown by the affidavits of jurors. That would have been contrary to the rule previously declared in that State.

In *United States v. Reid*, 12 How., 361, the affidavits of two jurors, offered in support of a motion for a new trial, stated that during the trial they read a report of the evidence in a newspaper, but that it did not influence their verdict. Chief Justice Taney, in delivering judgment, abstained from laying down any general rule as to the reception of affidavits of

jurors, or examining the decisions upon the subject, because the court were of the opinion "that the facts proved by the jurors, if proved by unquestioned testimony, would be no ground for a new trial. There was nothing in the newspapers calculated to influence their decision, and both of them swore that those papers had not the slighest influence upon their verdict."

The Court did not decide, but expressly declined deciding, whether the affidavits were or were not admissible. If they were rejected, the verdict of course stood. If the facts stated in them should be assumed as proved, there was nothing in them to impeach the verdict; and this not merely because the jurors were not influenced, but also because there was nothing in the papers calculated to influence them.

From this review of the authorities here accessible, it cannot be doubted upon which scale the weight of authority rests. The sages of the common law, it is seen, utter no discordant or uncertain sounds. Our Codes, on the subject of new trials, exactly correspond with those now in force in California. The conclusion is irresistible that it is wisest to hearken to the voices of enlightened observation and experience, coming from so many quarters, and safest to follow the footsteps of such great legal luminaries as Mansfield, Kent, Shaw, and others whose names have been mentioned. The policy and reason of the rule in upholding verdicts, far outweigh the objections urged against it. A verdict, as the name imports, (*veredictum*) is taken in theory of law to be absolute truth, and it is important that it should be thus regarded. All communications among the jurors are confidential; they are intended to be secret, and it is best they should remain so. When a verdict is recorded, the jurors cease to act under their oaths, in their official capacity as part of the court, and as individual citizens, freed from the burden of their obligations and responsibilities, they should not afterwards be permitted to appear as simple witnesses to impeach or undo their solemn acts.

The affidavits of these two jurors, Messrs. English and Dale, are therefore inadmissible in this case, to prove the alleged misconduct or irregularity.

But even if the precedent in *U. S. v. Reid* should be followed and these affidavits examined, I am of the opinion that they would not, under the peculiar circumstances, show sufficient

ground for a new trial. By the Code of Criminal Procedure, § 423, the Court "has power to grant a new trial when a verdict has been rendered against the defendant by which his substantial rights have been prejudiced." And again in § 537 no error or mistake in any proceeding "renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice in respect to a substantial right." By sub. 3, of section 423, a ground for a new trial is, when the jury have "been guilty of any misconduct, by which a fair and due consideration of the cause has been prevented."

The facts are, that on the 22nd of December, the case was given to the jury, and they then retired for deliberation, taking with them the written charge, which had been given by the Court. In the afternoon of the next day, Sunday the 23d, they sent to the judge a written request for further instructions; and afterward, in the presence of the parties and their counsel, they handed to the Judge, in open court, a paper, stating that they could not agree, and asking for answers to certain questions of law. The Judge declined to give further instructions at that time, for reasons written by him and read to the jury. In the forenoon of the next day, Monday the 24th, the jury were charged anew, in response to their request, from another written charge, in which the judge explained his former charge, and gave a further and thorough examination of the law of libel, as it exists in this Territory.

Now, on this branch of the subject the question arises: "What substantial rights of the defendants have been prejudiced by the alleged misconduct?" As stated in the motion and affidavits, the misconduct consisted in reading and examing the Statutes or Revised Codes of Dakota, and other works of law on the subject of libel, to-wit: on Sunday, December 23d, 1877.

In other words, the acts of misconduct took place the day before the second instructions were given. If so, what prejudice, or detriment to the defendants, could there be when on the following day, in open court, at their own request, they were fully and thoroughly instructed on the law of libel ; and when, on the latter day, they might still have asked any and all further instruction they saw fit, on any point pertaining to the case.

That they were not governed, or did not deem themselves governed, by any private examination of the law, is obvious from the fact that, by their unanimous consent, they desired further information from the court itself. The fair and reasonable presumption therefore, is, that they took the law from the court as given on the 24th, and not from the books they had read on the 23rd.

When this motion was on argument I thought the circumstances unique and peculiar, and so stated. But on subsequent research, it was found that there are precedents where such misconduct arose before a second charge to the jury. The first one is *Hartung v. The People*, 4 Park, Crim. R., 329, a conviction of murder. It was before the Supreme Court, at Albany, on an exception to the refusal of the court of Oyer and Terminer to grant a new trial for alleged misconduct of the jury. The alleged misconduct consisted of several particulars. 1. That the jury, during their deliberations, improperly possessed themselves of a copy of the Revised Statutes, and consulted the same, in relation to the crimes of murder and manslaughter, (which fact was established by proof not coming from jurors.) 2. That in like manner they obtained and consulted a newspaper containing a report of part of the evidence ; (this charge resting also, upon affidavit, *aliunde*.) 3. That the officers having the jury in charge, were present all or most of the time during their deliberations, (this charge, like the first, being on legal proof.) 4. That the verdict was rendered under the improper expectation that the prisoner would never be executed, (this, like the second exception, resting on affidavit *aliunde*.) 5. That the jury improperly sent a communication to the presiding judge without the knowledge of the accused or her counsel, or of the other members of the court. In delivering judgment, the supreme court, Hogeboom, J. said : " The application to set aside the verdict upon these grounds, was properly made to the court which tried the prisoner, and was refused by them, as to the second, fourth and fifth objections, upon the ground that they were unsupported by sufficient evidence, and unfounded in fact ; and as to the first and third objections, that no actual detriment ensued to the prisoner, inasmuch as though one or more of the officers were in the room, no im-

proper communication prejudicial to the prisoner took place between them and the jury ; and that although the jury did, at one period of their deliberations, examine portions of the Revised Statutes touching the offenses of murder and manslaughter, they subsequently appeared in court, and were specifically and imperatively instructed by the court as to the nature of those offenses and the discrimination between them. I do not deem it essential," continues the learned judge, "to travel over the entire evidence relied upon to establish the existence of these irregularities. I concur in the conclusions to which the court below arrived in regard to them on the questions of fact. This disposes of the second, fourth, and fifth objections, without the necessity of further remark. The first and third specifications were charges of mere irregularities, censurable ones it is true, but not resulting in any actual prejudice to the prisoner ; and I think we may safely dispose of them on that ground, expressing our concurrence in the views of the court below upon those points."

By reference to the original case in the Oyer and Terminer, (*People v. Hartung*, 17 How. Pr. 85) it will be seen that it was established by proof (other than that of jurors,) " that one of the jurors inquired of a constable who was in attendance, whether the jury could not bring in a verdict of manslaughter, stating at the same time, if they could do so, the whole jury would agree on such a verdict. The constable, in violation of his duty as well as his oath, undertook to give his opinion. He said he thought they could, but added that they had better consult their foreman, who being a justice of the peace, would probably know. The Revised Statutes were subsequently sent for by the jury, and their provisions in relation to the crimes of murder and manslaughter examined." The other charges of misconduct rested, said Harris, J., " upon the affidavit of the defendant's counsel who do not profess to have any knowledge on the subject themselves, but make their statements upon their information and belief. Nor do they give the sources of such information. From the character of the charges, however, it may be inferred that it was derived from some one or more of the jurors themselves. The constables who were in attendance upon the jury, have each so far as they could, denied the truth of these charges."

As to the exception that the jury improperly consulted a copy of the Revised Statutes, it was admitted that it was established by competent evidence ; and yet both courts denied the motion for a new trial. And why? For the sole and manifest reason that, after the misconduct, they were again instructed by the court as to the nature of murder and manslaughter and the discrimination between them.

A second precedent is *Wilson v. The People*, 4 Park Cr. R., 632, also a case of murder. A new trial was asked on the affidavit of the constable that, at the request of a juror, he handed to that juror a paper on which were marked the punishments fixed by law for the different degrees of manslaughter. The affidavit showed that this paper was handed to the juror before the jury came into court for further instructions. This element of the case was particularly noticed by the court in denying the motion.

I come, finally, to consider the alleged error in the charge to the jury. Although the learned counsel for the defense were so requested by the court on the hearing, yet they declined to speak to, or argue this point. It was so far abandoned, that they passed it over in silence ; but they did not withdraw it. I speak with all possible courtesy when I say that, if there be error as alleged in the motion, it should have been pointed out, and argued, and urged before me ; so that, by the light of legal criticism and authority, I might have a fair opportunity of reviewing the question. The specification, however, stands thus mutely before me ; and I was bound, at my own toil and investigation, to ascertain whether or not error was committed. I have examined it carefully and in all its bearings, and, as at present advised, am unable to find any such error.

The specification consists in an isolated passage taken from the second charge to the jury. They were instructed to consider both charges together ; they were written and taken into the jury-room. But the sense and true meaning of a paragraph, or extract, cannot be obtained unless by reading it with the context. This is a canon of interpretation everywhere. The whole charge to a jury should be taken together; and if without straining any portion of the language, it har-

monizes as a whole, and fairly and correctly presents the law bearing on the issues tried, the verdict will not be disturbed.

The jury were instructed in the very language of our Penal Code, that "every person who willfully, and with a malicious intent to injure another, publishes any libel, is guilty of a misdemeanor ;" and that "an injurious publication is presumed to have been malicious, if no justifiable motive for making it is shown." And again, that "in all criminal prosecutions or indictments for libel, the truth may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted." And further, that "no reporter, editor, or proprietor of any newspaper, is liable to any prosecution for a fair and true report of any judicial, legislative, or other public official proceeding, or of any statement, speech, argument, or debate in the course of the same, except upon proof of malice in making such report, which shall in no case be implied from the mere fact of publication."

They were also instructed that "if the prosecution shows the falsity of the matter contained in the publication, malice is, *prima facie*, implied. The falsity, in other words, is *prima facie* evidence of malice ; and proof of justification or excuse lies on the accused." Notwithstanding this, the question of malice, or "malicious intent," was left entirely to the jury in the following instruction, to-wit : "If you believe, beyond a reasonable doubt, that the article in question is not a fair and true report of public official procedings—but unfair and untrue—and that the accusations contained in the article are false, it is for yourselves to say that there is the absence of that willfullness and malice essential to convicting persons for the publication of a libel. The misdemeanor in this case consists in publishing a libel willfully, and with a malicious intent to injure another. You must find each one of the elements of the offense, beyond a reasonable doubt ; that there is a libel, that it was published by the defendants, willfully and with such malicious intent to injure John L. Pennington."

It is true as stated in the charge that the defendants did not produce a solitary witness before the jury ; and that all the

evidence in the case was produced by the prosecution ; yet still the court was careful to state to the jury as follows :

"It is now for you to find what justifiable motives these defendants have shown to you. Whatever evidence of that nature, or of any kind for the defendants, you may find in the testimony of the prosecution, *must go in favor of the accused.* Examine it all. Weigh everything in evidence carefully."

Now, under any fair view of all this, could the Court, consistently with its functions, have been any more particular in guarding the rights of the accused ? Nowhere in the instructions did the Court intimate an opinion that the article was a libel. It simply defined that offense; and the jury were told that, in determining the law and the fact, they must dispassionately examine the publication.

In no part of the charges did the Court state an opinion that the publication was made willfully and with malicious intent to injure ; on the contrary, the whole question was left to the jury. It is quite true that the Court, in response to the jury, asking if they could return a verdict for defendants, if they believed the statements were untrue, did state the presumptions arising from the falsity of statements in a libelous article. This the Court could not avoid.

Malicious intent may generally be proved in two ways: either by proof, or presumption of law. The Penal Code itself so prescribes. It declares that the terms "malice" and "maliciously," when applied to the intent with which an act is done, import a wish to vex, annoy or injure, another person, established either by proof or presumption of law.

The court was bound, therefore, to state any legal presumptions; and the more especially because the Code, under the head of libel, expressly enunciates that an injurious publication is *presumed* to have been malicious, if no justifiable motive for making it is shown. The main witness for the prosecution testified distinctly to the falsity of the statements, and by no witness of their own did the defendants attempt to show their truth, which would have been a justification, if with good motives. The whole evidence in the case coming, then, from the prosecution, what did the Court scrupulously

say to the jury? Why this: that whatever evidence of any kind for the defendants they might find in the testimony for the prosecution, *must* go in favor of the accused. They were also told in the clearest language possible that they *must find* each one of the elements of the offense, beyond a reasonable doubt: 1st, that there was a libel; 2d, that it was published by the defendants; 3d, that it was published willfully and with malicious intent; and 4th, to injure John L. Pennington, the person named in the indictment.

The privileges of editors and proprietors of newspapers were also fully set forth by the court, to-wit: that they are not liable to any prosecution for a fair and true report of any judicial, legislative or other public official proceedings, etc., except upon proof of malice, etc. And this entire question of privilege was squarely left to the jury. It was not and could not be pretended that the article in the defendants' newspaper had any relation to judicial or legislative proceedings; and it was left to the jury, without any intimation whatever from the court, to determine whether it fell within the meaning of "other public official proceedings." This was, certainly, very favorable to the defendants; for upon examination since, I have found a decision of the Court of Appeals of New York, giving construction to this portion of our statute, in which it is held that to apply the words "public official proceedings" to an executive act to be performed by a single official person, and which admits of no debate or deliberation, would be a perversion of the scope and meaning of this act." (*Sanford v. Bennett*, 24 N. Y., 26.)

And again in *Hunt v. Bennett* (of N. Y. Herald), 19 N. Y., 174, it was claimed that the alleged libel was the defendant's opinion of the plaintiff's character and qualifications as an officer, and that whether it was correct or not, the editor or proprietor had the right, in good faith, to express it. In that case, (under an almost identical statute), as in this case, it was asserted that the article was *privileged*. But what said the Court of Appeals? Just this, emphatically: "If the defendant's opinion of the plaintiff's character and qualifications as *an officer* had been contained in a remonstrance against his appointment to the office for which the defendant

asserted he was a candidate, and had been presented to the appointing power, without an unnecessary publication in a newspaper, as in this instance, of wide circulation, the point would have been well taken. As it is, he has been assailed through the columns of a public journal, as if he was a candidate for the suffrages of the people, and not of an appointing power, consisting of a few persons. It was not, therefore, a privileged publication."

Consequently, from these two decisions, this Court would have been justified in instructing the jury that, under our Code, the article in the defendants' newspaper was not privileged. Instead of doing so, this whole question, like the others, was left exclusively to the jury. It follows, also, that if not privileged, and not true, then the publication is legally presumed to have been malicious.

One other consideration, and I shall have finished this necessarily lengthy opinion. By our Code, on the trial of an indictment for libel, the jury have the right to determine the law and the fact. From this provision has sprung a misapprehension in the minds of some lawyers, tending to a belief that the Judge should not, in such a case, charge the jury at all, or, at least, that he was wrong in instructing them the second time. This is a grave misconception. Apart from our Code, the rule was so well settled that it became a maxim, that, " it is the office of a Judge to instruct the jury in points of law." Judge Cooley in his admirable work on Const. Lim., (page 463), states that, " wherever such provisions exist, the jury, we think, are the judges of the law; and the argument of counsel upon it is rightfully addressed to both the Court and the jury." " Nevertheless, we conceive it to be proper, and indeed the duty of the Judge to instruct the jury upon the law in these cases, and it is to be expected that they will generally adopt and follow his opinion."

While the jury are thus made judges of the law, as well as of the facts, still they are not, and cannot be, deprived of the right to ask the Court for information as to the law. They are chiefly laymen, taken from almost all the walks of life—are not versed in the law; and they have from time immemorial, by the common law, this inherent and constitutional

privilege. The trial by jury would not be preserved in its integrity, if the Legislative Assembly should undertake to deprive the jury of this ancient and essential right. It is a right so interwoven in the system of trials that it cannot be taken away without shattering the entire structure. For what is a jury trial? It is a trial of an accusation by twelve men lawfully chosen and sworn, in the presence, and under the direction of a Judge, learned in the law. Such Judge, in any trial, cannot refuse to give instructions when properly demanded of him. So to refuse would be to abdicate his official functions and duty—to deny to the jury a right demandable and obligatory, and to inflict the severest of blows upon the due administration of justice. It would, indeed, most properly subject the Judge to impeachment.

Consequently, our Code of Criminal Procedure, following carefully the common law, such as it was and is everywhere, expressly declares that in the first place, in charging the jury, the Court *must* state to them all matters of law which it thinks necessary for their information in giving their verdict. And, in the second place, without any exception whatever, that after the jury have retired for deliberation, if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court; and upon their being brought into court, the information required must be given.

In conclusion, I must be permitted to say, with all respect, that in all cases, but especially in one like this, the members of the bar (who are, to a certain extent, components of the court, and, as such, intimately connected with, and interested in, the due administration of the laws), should not allow erroneous views to be propagated, to the detriment of the tribunals, and of the law itself. The court cannot make, or unmake, laws. It must take them as they are, and not, as in some instances, it might wish them to be. A court must not deviate, one jot or one tittle, from the law as it is. If the law is bad, it is not for the judiciary, but for the people themselves, through their representatives in the Legislative Assembly, to change, modify or repeal it. In the instructions to the jury, I conscientiously. and without fear, favor or affection, laid down the law as I found it, and believed it to be. If in

discharging this high and solemn duty, I have erred, the remedy is plain and easy—not by appeals to popular notions or partisan feelings, but through the honorable channel of the Supreme Court.

The motion to set aside the verdict, and for a new trial, is denied.

By the Court:                         PETER C. SHANNON,
March 11th, 1878.                              Judge.

---

## PRACTICE.

### SUMMONS.  SERVICE OF, BY PUBLICATION.

Pre-requisites to obtain a valid order for the service of a summons by publication.

#### OPINION BY SHANNON, JUDGE.

The importance of complying with all the requirements of section 104 of the Code of Civil Procedure (Revised Codes, page 527,) in order to acquire jurisdiction, seems still to be overlooked, notwithstanding the rules of court, which were intended to be plain and perspicuous on the subject. This inadvertence is the cause of much trouble and labor to the Judge or Court, frequently involving the pains of an explanation of a statute upon which the decisions are numerous and explicit.

Aside from the well defined practice and expositions in New York, and other States, the attention of the profession is called to the case of *Ricketson v. Richardson*, 26 California Reports, page 149, which was an action to foreclose a mortgage, and in which that Supreme Court held that, as the sections, relative to publication are in derogation of the common law, they must be strictly pursued in order to give the court jurisdiction over the person of the defendant; and that a failure to comply with the rule prescribed, in any particular, is fatal where it is not cured by an appearance.

"An affidavit," said Sanderson, C. J., "which merely repeats the language or substance of the statute is not sufficient. Unavoidably the statute cannot go into details, but is

compelled to content itself with a statement of the ultimate facts which must be made to appear, leaving the detail to be supplied by the affidavit from the facts and circumstances of the particular case. Between the statute and the affidavit there is a relation which is analagous to that existing between a pleading and the evidence which supports it. The ultimate facts of the statute must be proved, so to speak, by the affidavit, by showing the probatory facts upon which each ultimate fact depends. These ultimate facts are conclusions drawn from the existence of other facts, to disclose which is the special office of the affidavit. To illustrate : "It is not sufficient to state generally, that, after due diligence, the defendant cannot be found within the State" (Territory,) " or that the plaintiff has a good cause of action against him, or that he is a necessary party ; but the acts constituting due diligence or the facts showing that he is a necessary party should be stated. To hold that a bald repetition of the statute is sufficient, is to strip the court or judge to whom the application is made of all judicial functions, and allow the party himself to determine, in his own way, the existence of jurisdictional facts, a practice too dangerous to the rights of defendants to admit of judicial toleration. The ultimate facts stated in the statute are to be found, so to speak, by the court or judge, from the probatory facts, stated in the affidavit, before the order for publication can be legally entered."

" Where this kind of service is sought, the proceedings should be carefully scrutinized and strict compliance with every condition of the law exacted, otherwise its provisions may lead to gross abuse, and the rights of person and property made to depend upon the elastic consciences of interested parties, rather than the enlightened judgment of a court or judge."

Under section 104 and rule IV of this district, what facts as to residence, must appear by the affidavit to satisfy the court or judge ?

*First*—That the person on whom the service is to be made, cannot, after due diligence, be found within the Territory. Beside asserting this necessary averment in the affidavit, facts to show such diligence should be disclosed, or that, absolutely, at the time, the defendant is not within the Territory.

*Secondly*—If his residence outside of the Territory is known, it must be stated so that the order may direct a copy of the summons and complaint to be forthwith deposited in the post-office, directed to him, at his place of residence.

*Thirdly*—If not known then the affidavit must state that. such residence is neither known to the affiant, nor can with reasonable diligence be ascertained by him.

And the affidavit besides this necessary allegation, must state the facts as to such reasonable diligence in the enquiry after the residence, [rule IV.]

Furthermore, it must appear by the affidavit, to the satis-faction of the court or judge, that a cause of action exists against the defendant; or that he is a proper party to an ac-tion relating to real property in the Territory ; and when so satisfied, by a properly drawn affidavit embracing all the requisites, an order may be granted that service be made by the publication of a summons in either of the cases specified in the five subdivisions of the section.

And in all cases where publication is made, the complaint. must be first filed ; and the summons, as published, must state the time and place of such filing. In addition to which statutory requirement, rules XXIV and XXV must be observed.

In *Evertson v. Thomas*, 5 How. Pr. R., 45, the objection was that the affidavit was defective in not proving positively that the defendant had property in the State. Parker, J., held the affidavit defective in not showing that the defendant had property within the State, saying "it is not enough to state this on information and belief. That is no proof of the fact. A person may give such testimony who has no personal knowledge on the subject. Mere hearsay, and belief founded on it, are not evidence." The defendant must have property here, in the enumerated cases, or the court acquires no jurisdiction to make the order. If the court has no jurisdiction to make an order of publication, a judgment founded thereon s void, (*Fiske v. Anderson*, 33 Barb. 71.)

An affidavit which states that the defendant resides in another State, but that deponent is unable to state his present place of residence therein, is not sufficient, (*Cook v. Farren*, 34 Barb., 95 ; 21 How. Pr. R., 286.)

The order itself should be carefully prepared by the attorney who sends or presents it. The requisites of such order may be easily found in Abbott's Forms, or Estee's Pleadings and Forms.

This court will insist upon a strict compliance with all the above requisites; and it must be fully understood that an affidavit for the publication of a summons, is not of such insignificance that it may be framed at careless random, and in any such loose manner as has generally been the custom.

The defects in the present application are of a minor kind when compared with others which have come before me; yet they are sufficiently obvious to cause the order to be denied.