63 686
81 224
63 686
84 454
63 686
133a 468

# TYLER TERM, 1884.

## A. H. BELO & Co. v. T. L. WREN.

(Case No. 1050.)

1. LIBEL.— A libel, as defined in the statute, may be committed by either making, writing, printing, publishing, selling or circulating the malicious statement with intent to injure another.

2. SAME.— Each act of either making, publishing or circulating a libel being a separate offense, it results that the circulation of a newspaper containing a libelous statement, beyond the limits of the county in which the paper issues, is an offense, no matter what may have been done with it in the county where the press of the paper is operated.

3. CIRCULATION.— A libel is circulated wherever the paper containing the libelous matter is sold or distributed. The fact that the libel may have been perpetrated by a publication or circulation of it in one county does not render it less a crime to circulate the paper containing the libelous article in other counties. It results that under article 1193, Revised Statutes (Ex. 8), a suit may be brought for damages for libel in any county in Texas in which the paper containing the libelous statement is circulated.

4. PRIVILEGED COMMUNICATION.— The public is not regarded as having such an interest in proceedings embodying defamatory matter as will outweigh the necessity of protecting the character of individuals, unless the proceedings are of a legislative or judicial character. (Following Cooley's Const. Law, p. 558.)

5. SAME.— For the publication of proceedings of a *quasi* judicial character to be privileged, they must have transpired before a body having the power to hear and determine matters submitted to its jurisdiction by the voluntary consent of its members. Cooley, Const. Lim., 448. Its judicial character alone pr tects it, and to give it such character it must have authority not only to hear, but to decide, matters coming before it, or to redress grievances of which it takes cognizance. (Following Barrows *v.* Bell, 7 Gray, 301.)

6. SAME — LEGISLATIVE PROCEEDING.— For the publication of matter otherwise libelous to be protected as a privileged matter on account of its being part of a legislative proceeding, the proceeding must not have been preliminary, *ex parte*, and secretly conducted; if preliminary and *ex parte*, the proceedings must at least have been openly conducted and subject to the inspection of the public.

7. SAME — LIBEL.— A committee was created by the legislature, from its members, to sit after its adjournment, and for the purpose of obtaining evidence by which the state's counsel might be guided in instituting criminal prosecutions against the perpetrators of land frauds and forgeries. It was not the purpose of the committee to do anything in aid of legislation or to report to any body; it determined nothing, exercised its judgment on no question requiring its judicial action, and evidence taken before it, being *ex parte*, could not afterwards be used in judicial proceedings. Parties whose conduct was the subject of inquiry before it were not permitted to appear,

and its proceedings were conducted in secret, with closed doors, the public being excluded. The evidence, after being taken before the committee, was to be filed, and it was filed, in the attorney-general's office, where a copy of it was procured, containing libelous matter, which was published in a newspaper. *Held:*

(1) The committee was an irregular and irresponsible committee, exercising doubtful powers, and formed for no purpose connected with the duties of the body from which it derived its appointment.

(2) The proceedings of such a committee have no claim to be regarded even as a preliminary examination. in the legal sense of the term.

(3) The public policy which required the proceedings to be kept secret was violated by their publication in the newspaper.

(4) The proceedings of such a committee, when published, cannot be regarded as privileged, and the publisher, if the matter be defamatory, is responsible in damages to the party injured.

8. FREEDOM OF THE PRESS.— Every facility should be allowed for the quick dissemination of useful facts, and the freedom of the press should not be restrained further than is absolutely necessary to protect private character from falsehood and slander.

9. COMMON LAW — ITS FLEXIBILITY.— The plastic nature of the common law will not allow the courts, in deference to the improvements of modern times, and the advance of newspaper enterprise, to so vary the cardinal principles of the law of libel that testimony libelous in its nature, required by the policy of the law to be kept absolutely secret, may be published in the columns of a newspaper.

10. CHARGE OF COURT.— An objection that the trial court did not direct the jury to separate the actual from the exemplary damages, in their verdict, comes too late when not raised until after appeal. The point should have been made in the court below by asking an instruction covering it.

11. DAMAGES IN LIBEL SUIT.— The amount of damages in a libel suit is left largely to the discretion of a jury. They may take into consideration the motives of the publication, while evidence as to the mode and extent of the publication is at all times admissible.

12. BILL OF EXCEPTIONS — PRACTICE.— The refusal of a district judge to sign a bill of exceptions, which it is apparent could not have affected the result in the supreme court, will afford no ground for reversal.

13. CASES DISCUSSED AND DISTINGUISHED FROM THIS.— McBee v. Fulton, 47 Md., 403, and Terry v. Fellows, 21 La. Ann., 375, reviewed and distinguished from this.

14. CASES APPROVED AND FOLLOWED, AND ELEMENTARY WRITERS CITED.— Com. v. Blanding, 3 Pick., 304; Rex v. Gridwood, 1 Leach, 142; Rex v. Burdett, 4 Barn. & Ald., 95; Sanford v. Bennett, 24 N. Y., 20; Barrows v. Bell, 7 Gray, 301; McCabe v. Cauldwell, 18 Abb. Pr., 377, cited and approved. The following elementary writers cited, as sustaining the principles announced by the decision: 1 Bishop, Crim. Practice §§ 53, 57, 61; Odg. on Libel, 532; Cooley's Const. Law, 568 and note, and Flood on Libel, 193, 194, 244.

APPEAL from Travis. Tried below before the Hon. E. B. Turner. Suit begun in the district court of Travis county, February 7, 1880, by Wren, the appellee, against A. H. Belo, J. J. Hand and D. C. Jenkins, doing business under the firm name of A. H. Belo & Co.,

and who were proprietors of the Galveston Daily News. The petition, after formal allegations, proceeded to allege that, during the year 1877 and since, many forgeries were committed of deeds and transfers to land certificates in Texas, and the devices resorted to to accomplish these forgeries, by reason of the general interest they excited, had become known to the people of the state. That many prosecutions were made of guilty parties, in Travis county, and convictions obtained; that defendants had an agent and representative, J. E. Thornton, and a business office in the county of Travis. The petition alleged that one T. E. Tullis was known to be one of the persons guilty of forging land titles, and one Jesse Stancel was believed to be a professional forger.

The petition, after setting forth apt preliminary allegations, continued:

" And the said defendants, well knowing the premises and the matters and things hereinbefore alleged, but contriving and wickedly and maliciously intending to injure your petitioner in his said good name, fame and credit, and to bring him into public scandal, infamy and disgrace with and amongst all his neighbors and other good and worthy citizens of this state, and to cause it to be suspected and believed by said neighbors and citizens that petitioner had been and was guilty of forgery, and to subject him to the pains and penalties by the laws of this state made and provided against and inflicted upon persons guilty thereof, and to vex, harass and impoverish petitioner, heretofore, to wit:

" On the 23d day of January, 1880, defendants being (as petitioner alleges) the publishers and proprietors of a certain newspaper known as and styled The Galveston Daily News, purporting to be and to have been published in Galveston city, in Galveston county, Texas, did falsely, wickedly and maliciously compose and publish and cause and procure to be published of and concerning your petitioner, and of and concerning the premises and matters and things hereinbefore alleged, in and by means of their said newspaper, and did falsely, wickedly and maliciously publish and cause and procure to be published of and concerning petitioner and the premises and things hereinbefore alleged, on the said 23d day of January, 1880, in the county of Travis and divers other counties and state of Texas, in and by means of their said news-paper, which defendants published, circulated and distributed, and caused and procured to be published, circulated and distributed, in said Travis and divers other counties, and amongst the good citizens thereof, a certain false, scandalous, malicious and defamatory libel,

containing, amongst other things, the false, scandalous, malicious, defamatory and libelous matter following, of and concerning petitioner, and of and concerning the matter and things hereinbefore alleged, that is to say, purporting to make and publish a statement of the said Jesse Stancel; and defendants did publish, as true and correct, said statement of and concerning petitioner, and of and concerning the premises as follows, and having the heading and caption, 'Land Frauds' (a part of and the heading and caption of said publication, meaning that said publication is and was a true and correct statement of and concerning petitioner, and of and concerning the premises and other things mentioned in said publication, and meaning that the said following statement is and was a true and correct statement of, amongst other things, forgery committed by petitioner as therein and hereinafter stated): 'Jesse Stancel' (meaning the said Jesse Stancel, and meaning that he, the said Stancel, was the author of the said statement which follows): 'I' (meaning the said Stancel, the speaker) 'knew Tullis' (meaning the said T. E. Tullis) 'in Galveston; I knew him here' (meaning Austin, Travis county, Texas); 'boarded with him in 1875, or in the same house with him. I know very little facts of what he was doing. I have, however, some little information of a transaction of his with a gentleman named Wren' (meaning petitioner). 'I think, in the summer of 1875, Tullis' (meaning the said T. E. Tullis) 'and Wren' (meaning petitioner) 'were friends, together all the time. I will state the details so far as I know: In the summer of 1875, in July or August, Wren' (meaning petitioner) 'went away from here' (meaning from Austin, Texas). 'I saw him and Tullis' (meaning the said T. E. Tullis) 'going to the Central depot together, and I was satisfied from intimations' (meaning statements) 'of Tullis' (meaning the said T. E. Tullis) 'that he' (meaning petitioner) 'was going away to fix up some crooked papers' (meaning thereby that plaintiff was going away to forge some title deeds to lands in the state of Texas). 'He' (meaning petitioner) 'was gone about ten days. He' (meaning petitioner) 'came back here' (meaning the said Austin), 'and the same evening after he' (meaning petitioner) 'came back I met him' (meaning petitioner) 'and Dr. Tullis' (meaning the said T. E. Tullis) 'and one or two others on the corner talking. He' (Wren) (meaning petitioner) 'was sporting a very fine suit of clothes, and he' (meaning petitioner) 'said he bought them in St. Louis' (meaning thereby that petitioner had made the money with which to purchase a very fine suit of clothes by committing forgery). 'Some months after that I met Dr. Tullis' (meaning the

said T. E. Tullis) 'in the land office. He' (meaning the said Tullis) 'was looking on the map of Erath county. He' (meaning the said Tullis) 'pointed out to me a piece of land in the north part of the county of which I think he' (meaning the said Tullis) 'said Pace was the grantee; but I am not certain about it. I think it was a league survey, and he' (meaning the said Tullis) 'remarked that Wren' (meaning petitioner) 'had bought it during his' (meaning petitioner's) 'trip, and they' (Tullis and Wren) (meaning the said T. E. Tullis and petitioner) 'had sold enough to pay the purchase money and what other expenses they' (meaning said T. E. Tullis and petitioner) 'had been to' (meaning thereby the said Tullis and petitioner had been guilty of forging the title to said land therein described). 'Dougherty, Connelly and Ammerman, of Dallas, were the agents for the sale. Some time after that there were some parties making mention to Wren' (meaning petitioner) 'about his' (meaning petitioner's) 'having obtained that survey so easily. He' (meaning petitioner) 'said he' (meaning petitioner) 'went to Mississippi and there bought it from the heirs. I do not know anything about the papers' (meaning the title deeds to the above-mentioned tract of land). 'My impression is that they were made by himself' (meaning that petitioner had been guilty of forging said title deeds to the tract of land above described). 'From a good many intimations I am satisfied that Wren' (meaning petitioner) 'and Tullis' (meaning said T. E. Tullis) 'were working together' (meaning that petitioner was a professional forger and was guilty of acting together with the said Tullis, a professional forger, in the commission of crimes as hereinbefore alleged of and concerning the said Tullis). 'Question' (meaning question asked the said Stancel). 'Where is Wren' (meaning petitioner) 'now? I' (meaning said Stancel) 'suppose he is in Austin' (meaning Austin, Travis county, Texas). 'I do not know Wren's initials' (meaning petitioner's initials). 'He' (meaning petitioner) 'is a young man. I would know him' (meaning petitioner) 'if I saw him' (meaning petitioner). 'His' (meaning petitioner's) 'occupation was that of a land agent — rather in a quiet way.'

"And now plaintiff avers that defendants, by all of said publication so made as aforesaid, meant, and that it was understood by all persons who read said statement to mean and did mean, that the statement so published by defendants was true, and that your petitioner was guilty of acting together with the said T. E. Tullis in committing the crimes as hereinbefore alleged of and concerning the said Tullis, and that petitioner had been guilty of committing the

crime of forgery at divers and sundry times, and was and is a professional forger, and that petitioner held and claimed lands in the state of Texas under and by virtue of false and forged titles made and forged by petitioner.

" And petitioner further says that the said newspaper and publication, published as aforesaid, was circulated and published to and amongst a great number of the good citizens of this state, in Travis and divers other counties in said state, and its contents was and were known, read and understood by said citizens. That by reason of the committing of the said wrongs and grievances by the said defendants as aforesaid, your petitioner hath been and is greatly injured in his said good name, fame and credit, and brought into public scandal, infamy and disgrace amongst his neighbors and other good and worthy citizens of this state, in so much that divers of those neighbors and citizens to whom the innocence and integrity of said petitioner in the premises were unknown, have, on account of the committing of the said grievances by the said defendants as aforesaid, from thence hitherto suspected and believed and still do suspect and believe petitioner to have been and to be a person guilty of forgery, and to have been and to be a professional forger; and have, by reason of the committing of the said grievance by the said defendants as aforesaid, from thence hitherto wholly refused and still do refuse to have any transaction, acquaintance or discourse with petitioner as they were before used and accustomed to have and otherwise would have had, to petitioner's damage in the sum of $20,000.

" And petitioner further saith that the said defendants, further contriving and intending as aforesaid, heretofore, to wit, on the day and year aforesaid, and at the time and place and in the manner and form as aforesaid, falsely, wickedly and maliciously did publish a certain other false, scandalous, malicious and defamatory libel of and concerning the said premises, matters and things hereinbefore alleged, and of and concerning petitioner, containing, amongst other things, the false, scandalous, malicious, defamatory and libelous matter following: that is to say, the said publication so made in said newspaper commenced with the heading and caption in the words, ' Land Frauds,' which said words were followed by the name ' Jesse Stancel,' immediately heading the said publication; that following said name, the following words were printed and published as aforesaid:

" ' Tullis and Wren were friends together all the time. I will state the details so far as I know: In the summer of 1875, in July or August, Wren went away from here. I saw him and Tullis going

to the Central depot together, and I was satisfied from intimations of Tullis that he' (meaning the said Wren) 'was going away to fix up some crooked papers. From a good many intimations I am satisfied Wren and Tullis were working together.'

"And petitioner says that by all of said publication defendants meant by the said heading and caption, 'Land Frauds,' that what was published following said head and caption, which is and was as hereinbefore shown, was and is a true account of fraudulent dealings in and forging of land titles and other instruments in writing, which if true would have affected an interest in land in the state of Texas, and that what was said therein of and concerning petitioner and said fraudulent dealings and forgeries was true; that by the said name 'Jesse Stancel,' defendants meant the said Jesse Stancel of and concerning whom petitioner has hereinbefore stated that the said Jesse Stancel was the author of said publication; that said author meant that your petitioner had been and was guilty of acting, together with the said T. E. Tullis, in committing the crimes and doing the things as hereinbefore alleged of and concerning the said T. E. Tullis, all the time the said Tullis had been engaged in so doing, and that petitioner was and is a professional forger. That the said author was stating what he knew. That in the summer of 1875, in July or August, petitioner went away from said Austin; that said author saw him, petitioner and said T. E. Tullis going to the Houston & Texas Central Railroad depot, at said Austin, together; that said author knew, from information given him by the said T. E. Tullis, that petitioner was going away to forge some title deeds to lands and to forge other instruments in writing which, if the same had been true, would have affected an interest in lands in the state of Texas; that said author knew from a good deal of information, that petitioner and said T. E. Tullis were acting together in committing the crimes as hereinbefore alleged of and concerning the said T. E. Tullis; that petitioner did forge the said papers which the said author said petitioner went away from Austin to forge.

"And petitioner now alleges that defendants well knew and all persons who read said publication knew and understood that the same did mean and have the same meaning and meanings as above hereinbefore alleged; and that defendants meant by their said heading and caption 'Land Frauds,' and by their said acts in publishing said statement, and were for these reasons understood to mean by all who read said publication, that the same was true.

"And petitioner further alleges that the publication and statement last aforesaid was published and circulated at the time and

place and places for the purpose and with the intents, and in manner and form and to and amongst the persons, as is hereinbefore alleged of and concerning the publication first hereinbefore mentioned; and that said last mentioned publication had the effect and damaged petitioner to the extent and in the way and manner and form as is hereinbefore alleged of and concerning the publication first herein mentioned. And petitioner says that by reason of the wrongs last complained of he has been damaged in the further sum of $20,000.

"Your petitioner, further complaining of the several wrongs and grievances so committed by the defendants as aforesaid, alleges that on the 1st day of January, 1875, petitioner was and has been ever since that time and is now engaged in business in the said county of Travis as a land agent, and as such transacted and transacts the business of buying and selling land and land certificates on commission, locating land certificates, obtaining patents from the duly constituted authorities of the state, and generally doing and performing such other business as is included in the business of land agent. That petitioner hath always exercised and carried on, and doth still exercise and carry on, the said trade and business with integrity and honesty and punctuality of dealing, and, before the committing of the grievances by the said defendants as aforesaid, had never been suspected of dealing fraudulently with persons who dealt with said petitioner. That by means of which said premises petitioner, before the committing of the said several grievances by the said defendants as hereinbefore mentioned, had deservedly obtained the good opinion and credit of all his neighbors and other good citizens to whom he was in anywise known, and was daily and annually honestly acquiring great gains and profits in his aforesaid trade and business. And petitioner says that by means of the committing of which said several grievances by the said defendants as aforesaid, petitioner hath been and is greatly injured in his good name, fame and credit with and amongst all his neighbors and other good and worthy citizens of this state, in so much that divers of those neighbors and citizens to whom the innocence and integrity and correct dealings of petitioner in the premises were unknown, have, on account of the committing of the said grievances by the said defendants as aforesaid, from thence hitherto suspected and believed and still do suspect and believe your petitioner to have been and to be a person guilty of the offenses and misconduct so as aforesaid charged upon and imputed to him and published of and concerning him by defendants; and have, by reason of the committing of the said grievances by the said defendants from thence hitherto wholly refused,

and still do refuse, to deal or have any transaction with your petitioner in his aforesaid trade and business, or otherwise, as they were before used and accustomed to have and otherwise would have had, to the damage of petitioner in the further sum of $10,000.

"And your petitioner, further complaining of the grievances committed by the said defendants as aforesaid, saith, that before the committing of the said grievances by the said defendants as aforesaid, petitioner was and is now the owner of, and has honest and valid titles to, divers tracts of land and interests in land situated in the state of Texas. That before the committing of the said grievances by the said defendants as aforesaid, your petitioner's title to said lands and interests in land had never been suspected to be forged or in any manner fraudulent. That said lands and interests in land are of no value to petitioner, except their market value to sell in the markets of the country; that the reasonable and fair market value of said lands and interests in land, before and at the time of the committing of the said grievances by the said defendants as aforesaid, was $15,000. That by reason of the said grievances committed by defendants as aforesaid, divers of petitioner's neighbors and other good citizens of this state, to whom the innocence and integrity of petitioner, and the honesty and validity of his said title, were unknown, have suspected and believed, and do now suspect and believe, that petitioner's title to said lands and interest in lands is fraudulent and forged. By reason of which petitioner says the value of said lands and interest in lands in the markets of the country has been greatly damaged and reduced, to the further damage of petitioner in the sum of $10,000."

The defendants, after pleading to the jurisdiction, and alleging their residence in Galveston county, pleaded as follows:

"2. And now come these defendants in the above-named cause, and without in any manner waiving, but on the contrary expressly reserving, all benefit from their foregoing plea to the jurisdiction, now for answer say: that they are not guilty in manner and form as the plaintiff has alleged, of the many trespasses, wrongs, injuries and other enormities laid to their charge in said petition, and thus they put themselves on the country, etc.

"3. And for further answer in this behalf these defendants deny all and singular the allegations in the plaintiff's petition contained and demand strict proof thereof.

"4. These defendants, further answering, deny specially that the said plaintiff was or is damaged, or in any manner injured, by the alleged acts of these defendants as set out in said petition.

"5. And for further answer these defendants say that they deny

the charge of malice made against them in the petition of the plaintiff; and they say that whatever of the acts (if any) named in the plaintiff's petition they may have done or committed, were done in the usual and ordinary course of their business as the printers and publishers of a daily newspaper in the city of Galveston, and not from any ill-feeling, malice or ill-will to the said plaintiff or to any one else, and without any desire to defame, injure or in any manner damage the character and reputation of the said plaintiff or any one else.

" 6. These defendants further answer and say that the said publication set out in the plaintiff's petition as the basis of his cause of action against these defendants (if made at all by these defendants) was not made by them maliciously, but was given to the readers of their paper and the public generally, simply as a portion and part of a matter of general interest and public information, and constituted a part of an official report of a special committee appointed by the sixteenth legislature to report on the matters and things treated of in the matters so published, and the said matter so published constituted only a portion of said report, which was then in course of publication, in their said newspaper. They further say that said official report of said committee was not a secret or private paper, but that said report of said committee constituted a portion of the regular proceedings of said legislative body; and that the members of said committee were members of the senate and of the house of said legislative body, and in making said report acted in their official capacity in the regular discharge of their duties as members of said committee under the instructions of the legislature; and that said legislative proceedings, of which said alleged libelous matter constitutes a part, were, before their publication by these defendants, known to the public, and were filed, deposited and constituted a portion of the public archives, open to the inspection of the citizens of Texas, in the office of the attorney-general of the state of Texas, and were a part of the public current history of the state, and were published, after being filed as aforesaid, simply as a part of the regular proceedings of said legislative body, it being now and having been the custom and habit of these defendants and of their predecessors having control of said daily newspaper for the last thirty years, to publish, if possible, the public proceedings of all public bodies assembling in the state of Texas: such as legislatures, courts of justice, civil and criminal, conventions, synods, associations and the like; and the matter alleged in plaintiff's petition to be published was (if published

at all) set forth, without note, comment or criticism of any kind by these defendants, and published in the usual course of their business, and without any malice to the said plaintiff, or any one else, and with no design to injure the said plaintiff or any one else; and all this they pray may be inquired of by the country; and they put themselves on the country," etc.

The plaintiff, in his first supplemental petition, demurred to the matter contained in sections 5 and 6 of defendants' answer, and generally to all the allegations of the answer. He averred that the legislative committee sat after the legislature adjourned; that they were not required to report to the legislature; that their functions were not such as the legislative department could authorize; that they had no jurisdiction to make a preliminary trial; that the committee was created in violation of the constitution, and that they never reported to the legislature. He also alleged that it was the policy of the state to keep the proceedings of the committee secret; that their examinations of witnesses were secret, and *ex parte*, and that plaintiff was not permitted to be heard before it in his defense, and their proceedings were not privileged to be published.

The defendants, on the 15th of May, 1880, filed their first supplemental and amended answer, in which they renewed their plea to the jurisdiction, denied all of plaintiff's allegations, denied the charge of malice, and averred that the publication was made in the ordinary course of newspaper business; in effect, that the widespread interest existing in the security of land titles, and the belief that extensive frauds and forgeries were practiced, was such that the legislature passed, in 1875 and 1876, laws for their detection and the punishment of forgers; that in 1877–78 and 1879, many arrests and convictions were made for forging land titles; that in 1879 a statute was passed appointing a joint committee of two members from the house, and one from the senate, to continue the investigation of land frauds and forgeries, authorizing it to sit during the vacation of the legislature, with authority to administer oaths and take and compel testimony of witnesses, etc. That the committee was required to reduce its report to writing, and take down the testimony of witnesses, and to deposit it, with all other testimony taken, in the office of the attorney-general of the state; that there was a general interest felt by the public in their acts; that in view of this fact, defendants, desiring to publish the proceedings of that committee, not through malice, but for public information, after taking the advice of their attorneys, Ballinger, Jack & Mott, published the same. They alleged that said report of the committee was not a secret

paper, but that it had been obtained from the attorney-general's office by them, and was then an archive of the state. They denied that they had garbled or altered the report (as charged), and that no part of it had been omitted through malice.

The following portions of the answer were stricken out:

[And they further say that it has been the custom and habit of these defendants since their connection with their said newspaper and of their predecessors for more than thirty years past to publish, if possible, early, full and correct accounts of the proceedings of all public bodies in this state, their acts, reports, resolutions, petitions and addresses and journals, and they have heretofore and do now publish each and all the proceedings of the legislature, courts of justice, civil and criminal, of all conventions, synods, assemblies, and all like public bodies assembled in this state.]

[*Fifteenth.* These defendants further say, that besides publishing said official reports, without comment, note or criticism, that on every occasion they have voluntarily and without any charge therefor allowed any and all persons who might deem themselves aggrieved, full and free access to the columns of their paper, to vindicate themselves, and that had plaintiff desired to vindicate himself they would freely and cheerfully publish his defense as they had published those of others.]

They denied specially the damage charged.

The plaintiff, in his second supplemental petition, excepted specially to the defendants' last amendment, setting forth, among other things, that the sitting of the committee itself, after the adjournment of the legislature, was not authorized by, but was in violation of, the constitution; that the proceedings of the committee were not a part of legislative proceedings; that the publication being unauthorized, the motives of defendants were immaterial; that defendants could not publish false and defamatory matter concerning plaintiff; that they did not publish a fair and complete statement, and that the words published were actionable *per se*, and imported damage without proof thereof.

By trial amendment the publication of the alleged libelous matter in Travis county was specially denied, averring that their newspaper, which it was alleged contained it, was published in Galveston county, and not elsewhere.

Trial and verdict for plaintiff for $7,500 damages.

The plaintiff proved by George L. Robertson that he received by mail, in Austin, Travis county, the Galveston News, of January 23, 1880, which contained the following article:

## "LAND FRAUDS.

"Jesse Stancel: I knew Tullis in Galveston. I knew him here; boarded with him in 1875, or in the same house with him. I knew very little facts of what he was doing. I have, however, some little information of a transaction of his with a gentleman named Wren. I think, in the summer of 1875, Tullis and Wren were friends, together all the time. I will state the details so far as I know: In the summer of 1875, in July or August, Wren went away from here. I saw him and Tullis going to the Central depot together; and I was satisfied, from intimations of Tullis, that he was going away to fix up some crooked papers. He was gone about ten days. He came back here, and the same evening after he came back, I met him and Dr. Tullis, and one or two others, on the corner, talking. He (Wren) was sporting a very fine suit of clothes, and he said he bought them in St. Louis. Some months after that I met Dr. Tullis in the land office. He was looking on the map of Erath county. He pointed out to me a piece of land in the north part of the county, of which I think he said Pace was the grantee; but I am not certain about it. I think it was a league survey, and he remarked that Wren had bought it during his trip, and they (Tullis and Wren) had sold enough to pay the purchase money, and what other expenses they had been to. Dougherty, Connelly and Ammerman, of Dallas, were the agents for the sale. Some time after that, there were some parties making mention to Wren about his having obtained that survey so easily. He said that he went to Mississippi and there bought it from the heirs. I do not know anything about the papers; my impression is that they were made by himself. From a good many intimations, I am satisfied that Wren and Tullis were working together."

The plaintiff then proved by the witnesses Carlton, Still, Miller, W. P. Gaines, F. Everett, Wm. F. Castles, P. De Cordova, R. M. Swearengen, I. H. Collett, S. H. Darden, R. J. Breckenridge, A. P. Wooldridge and L. T. Fulmore, all citizens of Travis county, that his reputation as a citizen for fair dealing and as an honest man was good, one witness stating that he was about to form a partnership connection with him, but was deterred from doing so by the publication in the Galveston News. It was shown that the plaintiff had been elected to the highest office in the order of Odd Fellows in Texas, for the year succeeding the trial. It was also shown that Tullis had been convicted of forging land titles, and also Jesse Stancel. One witness (Castles) testified that plaintiff and Tullis were together a good deal, but did not know of any interest between them in land matters.

L. T. Fulmore testified: "Land forgeries were talked about in 1878 and in 1879. Some terms in connection with land frauds acquired a meaning different from their usual signification — 'land shark,' 'land grabber,' for instance. 'Crooked papers' means fraudulent and deceitful transactions concerning land titles — forged titles. 'Crooked papers' in this article is an expression calculated to reflect on Mr. Wren; though 'going away to.fix up some crooked papers,' might mean an attempt to correct and straighten papers that have been found to be crooked. 'Papers made by himself,' I should think, signified forged by him. From the words, 'think Tullis and Wren were working together,' I should suppose that they were interested together in those papers. Tullis was arrested in the fall of 1877, and from that time up to the last of last year his forging operations were matter of public notoriety; he was regarded as one of the head chiefs in that business."

W. C. Walsh testified: "I am not a subscriber to the News, but I generally buy it from the newsboys; was commissioner of the general land office; I remember the News publication concerning Mr. Wren, but don't remember when it was. I may have heard casual remarks about Mr. Wren in connection with that article. I heard a general expression that the publication was injurious and wrong to some when they were not given a chance to explain. 'Crooked papers,' in talking of Ham's or Tullis' operations, would indicate something improper or fraudulent; some palpable defect. To say of a man charged with forgery that he made the papers, would mean that he forged them himself, or had it done."

Being cross-examined, the witness stated: "I first heard of Tullis' operations a while before he was arrested; there was suspicion against some of these parties for some time before: Tullis, McCullouch, Doyle, Talmage. The first intimations I had were from Capt. Fisher, in the land office. He took me in a private room and showed me some forged papers. I remember one filed in the land office, in which Wren and Tullis were interested."

Rhoades Fisher, being sworn, testified: "Had been chief clerk of the land office since January, 1874. Part of my duty has been to hunt up and investigate forged titles. I have been acquainted with Wren since 1874. I have the immediate control of the files. Wren frequently has business transactions with the land office. I never saw anything crooked in his business there. I suspected Ham, Tullis, the two McCullouchs, Stancel, Wynne, Stewart, and a good many others. My suspicions were derived from information in the land office. I never heard Wren's general reputation for honesty

questioned up to January 23, 1880. I take the Galveston News, monthly, from the newsdealers here. I saw a copy of it containing the article as to Wren, in the winter of 1879–80. (The News of January 23, 1880, was here exhibited to witness.) This is the same article. The terms 'crooked papers' in it I would take to mean forged papers; 'working together with Tullis' would mean that he was engaged with Wren in forging land titles; 'papers being made' means that the papers were being manufactured. I have heard persons speak of the publication as being calculated to injure the parties mentioned. I have not heard it discussed frequently, and then only in the office."

Being cross-examined, the witness stated: "I have been watching guilty parties since 1873. I was then in the land office as clerk, not chief clerk. I don't recollect whether in 1875 or '76; I came across crooked or other papers in which both Wren and Tullis were interested together. They were at the land office very often. I never found any papers that led me to suspicion Wren; but I did look with suspicion upon every man that came with Tullis, or Wynne, or Stancel or McCullouch. I watched Wren, as it was my duty to watch everybody. Wren and Tullis were interested together in one or two files which were correct. I don't remember seeing Wren and Tullis together on the streets. I had no reason to suspect any of Wren's papers with being fraudulent."

John J. Hand testified: "I am one of the defendants and one of the publishers of the Galveston News. I don't know its exact circulation in January, 1880; it was over six thousand; about half of its circulation is in Galveston, the balance over the state. I suppose every town of five hundred inhabitants took some. We had a circulation in three hundred and fifty or four hundred and fifty towns. I am a practical printer. (The Galveston News of January 23, 1880, was here exhibited to witness.) This might have been printed by others; all newspapers can be successfully imitated; it appears to be a paper issued from our office."

Being cross-examined, the witness stated: "The statement on the first page of the paper, about the office of publication, is required by the postoffice laws or regulations. Galveston was the place of the publication of the Galveston Daily News, on January 23, 1880, and before and since then. I became connected with the News in 1868. In 1880 it was not published in Austin, nor printed there."

Being re-examined, the witness stated: "I don't know how many subscribers we have in Austin. I do not look after the subscribers; I have charge of the mechanical department."

Kenney, the postmaster, testified that seventy copies of the Galveston News, in January, 1880, were distributed in Travis county.

Thos. E. Sneed testified: "I have been acquainted with Wren four or five years. I don't think I have had any business transactions with him. I don't think I heard any discussion of his general character for honesty until the time of this publication on January 23, 1880; and after that I never heard any general expression about his character. The effect of this publication, on those who knew Mr. Wren, was to elicit expressions of incredulity about the statements; but I can't say that I heard any expressions from any one who did not know him. I was employed by Gov. Hubbard, in October, 1877, to operate with the county attorney in prosecuting land forgers, and have since then been connected with all the land forgery prosecutions in this court. I was before the legislative committee, perhaps three times, at their request. O'Leary, their short-hand reporter, was present; and on one occasion, Rhoades Fisher; the other times no one was present, except O'Leary, the sergeant-at-arms and the committee. They sat during vacation, in the hall of representatives. I saw nobody there, except those who went there on business. No secrecy was enjoined upon me. I showed them some files and papers I had in connection with land forgery prosecutions."

Being cross-examined, the witness stated: "I knew of Wren some time before becoming acquainted with him. I knew he had an office in the Brown building; but did not know what his business was. My attention was first specially called to him at the time of Tullis' arrest, by his going on the latter's bond and manifesting quite an interest and indignation. Tullis, being about to run off, he was re-arrested on a warrant from a United States commissioner; and I heard Wren say it was needless to go on his bond again, as the authorities were determined to incarcerate him. Wren's conduct was that of a man who believed Tullis was unjustly accused; but he afterwards admitted that he had been deceived. He acted like a friend of Tullis. I heard some persons say they had strong convictions that Tullis had been in the business long before, and putting that together with Tullis and Wren having been together a good deal, they expressed some suspicions of Wren; but those who had no such convictions as to Tullis had no such suspicions. I had suspicions against Tullis about a year before his arrest, from examining some files in the general land office. At the time of the arrests I can't say I had any suspicions of Mr. Wren; but there was a general feeling of uneasiness as to everybody engaged in the land busi-

ness. I don't know of any instance when Wren and Tullis made any joint purchase of land; nor did I come across any instance of Wren representing Tullis or any of his myths."

Being re-examined in chief, the witness stated: "There existed suspicions against Tullis and Stewart since 1874, when indictments were found against Miller and Parker."

Andrew Neill testified: "I have resided in Austin for the last two years. I appeared before the legislative frauds committee as a witness, at their request. I was sworn and testified. I was assured that my testimony was to aid the officers in prosecuting land frauds, and that the investigations of the committee were in the nature of those of a grand jury, and that everything was in secret. Rhoades Fisher was present, and I understood he was under the same obligation of secrecy. No one else was present, except three committee-men and Mr. O'Leary, their clerk. I saw the publication about Mr. Wren. (The News of January 23, 1880, was here exhibited to witness and compared by witness with a slip of the News produced by witness as having been cut out by him out of his News of that date, and containing the land fraud article.) This is the publication I read."

Being cross-examined, the witness stated: "It was after the adjournment of the legislature that I appeared before the committee. I appeared before them two or three times. The sergeant-at-arms was outside of the door."

Being re-examined, the witness stated: "I have heard Mr. Wren's character, as affected by this publication, canvassed a good deal immediately after the publication. It was canvassed that it would affect him considerably to his injury."

C. S. West testified he considered Tullis an honest man until after the land fraud exposure.

The plaintiff testified that, from 1872, he had been in the land business, and from then until January 23, 1880, it was worth to him $2,000 each year; owned eight thousand or ten thousand acres of land; had offered his lands for sale at half what he asked before the publication, and could not sell them; thinks, from the assertions of friends, that the publication had injured him; never knew of Stancel's evidence against him until he saw it in the News; thinks drouth and the stop of immigration also affected the sale of his land; owned two pieces of land jointly with Dr. Tullis; was never before the land frauds committee; was never summoned, and had no chance to meet the charges against him.

Jo. H. Stewart testified that he was a witness before the land

frauds committee; the members and O'Leary were present. The session was secret; he was sworn to secrecy.

The defendants proved by Mr. Ballinger, their attorney, that Messrs. Jenkins and Hand, defendants, sought counsel of him, and were advised by him that it was their privilege to make a fair and satisfactory publication of the committee's investigation; that he believed they had a right to do it as a privileged communication; knew that Stancel's reputation, before he left Galveston, was bad. He was not informed, when he advised the defendants, that the proceedings of the committee were in secret, and not public.

Hamilton Stewart had generally been engaged in editing a newspaper for forty-three years; his rule was to publish whatever was of public interest, if he believed it to be true, without regard to who it would hurt.

O'Leary was clerk and stenographer to the legislative land frauds committee, which sat about three months; was also assistant editor of the News when it began to publish proceedings of the committee. Knows of nothing relevant being omitted from the published reports. The proceedings of the committee were generally private. Some persons came who were not placed under oath of secrecy. The committee sat with closed doors. Two members of the committee told him they had no objection to the proceedings being published. Witness deposited the written testimony taken before the committee in the attorney-general's office.

John E. Thornton proved that the Galveston News belonged to Belo & Co., the firm being composed of defendants. He copied the testimony taken before the committee for the Galveston News; copied it in the attorney-general's office. At one time he declined to send it down for publication, and so told the attorney-general, because some sheets of the original manuscript were missing — about ten pages. He notified defendants that a part of the testimony was missing, and they directed him to send a full copy of the report.

Being re-examined, the witness produced a letter received by him from the defendants, dated November 14, 1879, and stated: This is the letter of instructions I received from the defendants. Said letter was thereupon introduced in evidence, as follows:

"GALVESTON, TEXAS, November 14, 1879.

"*Mr. John E. Thornton:*

"DEAR SIR — We have consulted Messrs. Ballinger, Jack & Mott upon the publication of the testimony taken before the investigating committee appointed by the sixteenth legislature. Their first inquiry was: 'Is the testimony in the attorney-general's office open

for the inspection of any citizen of the state who may desire to see it, as it is for a News reporter?' Supposing this was the case, an affirmative answer was given. We desire that there shall be no lawsuits attendant upon the publication of this matter; and therefore we wish you to get some document or oral assurance from the governor or attorney-general that will cover this point, showing that it is a public document and open to all. Further: There must be no comments made by the News as to the guilt or innocence of the parties named by the respective witnesses; letting the testimony speak for itself. Nor shall any portion of the testimony that accuses one, or shields another, be omitted. *The published matter must be a transcript of the record;* only that portion being omitted that is not necessary to a full understanding of the whole affair.

"An introduction to the initial publication will be written in the office, which will cover all necessary points. Handle this matter carefully and secretly. Yours truly,

"A. H. BELO & CO.

"Hand."

It was admitted that Duncan, Baker and Pickett were duly appointed a joint committee in accordance with joint resolution No. 19 of the sixteenth legislature.

J. J. Hand, one of the defendants, testified as follows: "I have been a practical printer and publisher and in the newspaper business forty-six years, and have been connected with the News since September 6, 1868. I was first in charge of its mechanical department. On March 1, 1870, I became one of its owners. Belo is general manager; Jenkins is managing editor, and I have charge of the mechanical department — comprising the job room, composing room, press room and electrotyping room. The way we came to publish this report of the legislative committee is this: We publish a newspaper which is supposed to give every day an epitome of all the news in the country; and it is our duty as journalists to give this news in full; and I think our readers would have just cause to find fault with us if we failed to give this news. I considered that it was of the first importance that the testimony and matters reported by this committee should be given to our readers. It was made a matter of consideration in our office. We talked the matter over; and Mr. Jenkins and I went to see Messrs. Ballinger, Jack & Mott about it. Mr. Belo was then absent from Galveston on business. We submitted the matter to them, and told them we wanted to publish the report if we could legally do so. After consulting seven or eight authorities they said it was privileged matter;

but with this proviso — not to exclude any part of the evidence necessary to a full understanding of the whole. Neither Mr. Jenkins nor myself at that time knew any of the contents of the report. I did not know any particular part of the contents at the time it was published. We had no other consultations. In the first place Mr. Jenkins and I consulted about it and concluded we ought to give it to the readers of the News; we then consulted Ballinger, Jack & Mott. The result of that was that we wrote to our correspondent at Austin, instructing him to get the report. (The letter referred to above, dated November 14, 1879, from Belo & Co. to Thornton, was here exhibited to witness.) This is the letter I wrote after consulting our attorneys. After the copy of the report came down to the office the managing editor had control of the publication. Mr. Lowe was the managing editor. All matter is first examined by the editor in chief, Mr. Jenkins, and, if approved, is placed in the hands of the managing editor to put in proper shape. The manuscript was from Mr. Thornton; his manuscript is never changed; it is universally correct. The first publication of the land frauds testimony was, I think, in the issue of January 7, 1880, and stopped on February 14, 1880, on account of press of matter. We sometimes stopped the publication for two, three or four days, if other matter considered of more immediate importance occupied much space; the current news of the day could not be deferred. The testimony is preceded by the letter of the attorney-general and of Senator Duncan in some issues, and in others these letters are omitted. We make up our third page first, as the easiest to make up, it having no current news received after dark. The form is made up, sent down and stereotyped. We print from stereotype plates and not from the forms, and it cannot be changed afterwards. The second page also does not contain important news, but mainly editorial matter, and goes down after the third page. When we come to the fourth page, on which this report was printed, we do not know how many telegrams will be received during the night, and how much the first page, which contains the telegrams and latest news items, will be pushed for space, and how much will be transferred to the fourth page; but the managing editor gives out matter sufficient to fill the fourth page; and it happens that sometimes for a day or two matter set up for the fourth page is crowded out by excess of matter coming in late; and not having space on the first page for it, the fourth page must be accommodated to it. This testimony was sometimes, under such circumstances, set up, and when the foreman came to make up the form he had to exclude some-

thing, and supposing these letters of less consequence than the other matter, excluded them; or sometimes excluded the whole to give place for what was considered more important matter. (A file of the Galveston News was here exhibited to witness and identified by him.) The testimony as published runs from January 7, 1880, to February 14, 1880. From January 15, 1880, to March 4, 1880, there are divers publications in the News, with reference to the land frauds, in vindication of persons assailed in the land frauds testimony; as, for instance, Grooms, in defense of Capt. Fisher and others, including W. A. H. Miller, with a letter from Baker, chairman of the committee, on the subject. They appear in the News as follows: January 15, 1880, letter from Grooms; January 25, 1880, Fisher defended in communications from W. C. Walsh, commissioner; H. H. Boone, former attorney-general; C. S. West, Peeler & Maxey, Geo. McCormick, attorney-general; February 7, 1880, letter from Mrs. Ham; February 12, 1880, letter from Dr. Erwin; February 20, 1880, Bartlett's defense; February 24, 1880, report of Detective Foster; March 4, 1880, letter from W. A. H. Miller, preceded by a letter from Baker, chairman of the committee.

"I was not acquainted with the plaintiff before and at the time of this publication. I had never heard of him. I did not know such a man existed, and never saw him until a few days ago, when he was pointed out to me. Jenkins and Belo had no acquaintance with him. I had no knowledge that his name would appear in it. We did not discuss his character at the time of the publication, as we did not know such a person existed."

Being cross-examined, the witness stated: "I don't remember of anything being said by us in our interview with Ballinger & Jack about the proceedings of the committee and the testimony being taken in secret. We sent a copy of each of the four papers contained in the file of the News, I have identified, to each of our subscribers. Outside of Austin, the News is sent to three hundred and fifty or four hundred places where we have subscribers. The last publication of the land frauds testimony was in the issue of February 14, 1880. We have not completed the publication. Neither myself nor Mr. Jenkins ever consulted with O'Leary as to how the testimony was taken by the committee."

Being re-examined in chief, the witness stated: "I think the testimony of George Johnson was sent down, and also the testimony of Andrew Neill; it may be in our office, and not enough of it to make another publication. I think there are some portions of the testimony not yet published. The testimony of L. M. Johnson has been

published. I suppose there is more of the report to be published, for Mr. Thornton sent it down. Nothing has been taken out or suppressed by us. Sometimes Duncan's letter was not published with the testimony. Nobody but the foreman had anything to do with that."

George McCormick testified: "On January 8, 1879, I was and am now attorney-general. My office is at the capitol. I was away from the city when the legislative committee closed its labor. When I returned, a day or two after they adjourned, I saw on my table in my office the evidence taken by the committee, together with the papers I had sent to them previously at their request. I took charge of them, as the joint resolution had designated my office as the place of their deposit.* I did not examine them carefully then. Having every reason to believe the testimony would be deposited in my office, and finding it there on my return with the papers I had sent to the committee, everything led me to conclude it was their report I found with my papers. (The testimony taken before the committee was here exhibited to witness.) I have no doubt this is the identical report of the committee. I don't remember when the reporter of the Galveston News called on me about this report. I did not consider that the paper was secret; I considered that any man who was a gentleman could look over them. I let Mr. Thornton look over them. He asked me for authority to publish them; and as I did not regard them as private papers, I thought any respectable person could do so. I remember of three or four persons seeing them, one of whom was Capt. Josslyn. I had no objection to anybody seeing them. Thornton commenced copying the report in my office. I had to go off and had not read it; and he copied it with the understanding that it was not to be published without my consent. He was several weeks copying it. I wrote to Senator Duncan, a member of the committee, about the application of the News for leave to publish the report, and I received his reply as published in the News. I then wrote the note which also appears in the News, and gave both these letters to Mr. Thornton. They never published anything until I gave them these letters. When the first publication was made I was surprised to see they had published a part of the testimony I had objected to being published. I consider this report a record of my office. The law requires me to give certified copies of any papers and opinions in my office on demand. I con-

---

* It was provided that the testimony taken before the committee might be filed in the office of "any attorney representing the state in matters connected with land forgeries and frauds."— REPORTER.

sidered the report of the committee as private, only so far as might be necessary for the protection of pending prosecutions; any other publisher could have seen it on application. I think the evidence of both committees is in this report. At one time a portion of the evidence was not in my office, it having been, as I understood, turned over to the lawyer prosecuting land forgers. It was soon afterwards brought in. I think it was all in when Mr. Thornton sent his copy down. The letter of Senator Duncan, published by the News, is in answer to a letter from me to him, dated November 24, 1879, as follows:

"'NOVEMBER 24, 1879.

"'*Hon. John M. Duncan, Longview, Texas:*

"'The evidence taken before your late committee was deposited in my office during my absence on official business, accompanied by the request as to what your committee considered should be done with it; or rather whether you considered that it should be kept private and not made public in any way. I desire to carry out the views of the committee in the matter; but dislike to refuse those who desire access to your report, or rather the evidence taken before you. As far as I have looked into the matter, I am not inclined to think that its publication will tend in any manner to defeat the objects for which the committee was raised, but, to the contrary, will aid in carrying out that object, by giving information to those mostly interested in defeating the forgers. If I am correct in this, and you and the other members of the committee think as I do, will permit Mr. Thornton, the agent of the News, to make such publication, which he is anxious to do. I will be obliged if you will write me fully on the matter at once, as I shall be governed in my disposition of the mass of evidence taken, by *your suggestions.* The law, I believe, required it to be deposited in this office; the object, I suppose, was that the facts it contains should be given to the public in such way as should accomplish the most good to those who have been swindled; of course, I shall exercise my discretion as to what portion shall be published, having in view the necessity of keeping secret as to those implicated who might, by their being notified, escape the hands of the law.

"'You have no doubt observed that Ham and others interested threaten to publish and make known their wrongs to a sympathetic public. If the public are to have part of the facts any how, why, to my mind, the best plan is to let them know all; for this reason I think it best to make your report public.

"'I am very respectfully, etc.,

"'GEO. MCCORMICK.'"

Being cross-examined, the witness stated: "When Mr. Thornton asked me for permission to make the publication, I made a verbal statement to him of the same import as I afterwards embodied in my published letter, that certain portions of the testimony were not to be published. The News did not comply with my order. The report which I have identified is the entire testimony; there is no signature or certificate attached to it. There was no report, strictly speaking; the committee was not required to make any report."

Being re-examined, the witness stated: "The News did not comply with my orders by publishing evidence of parties known to be guilty, implicating parties who had been instrumental in convicting land forgers. The other restrictions I did not regard as of any importance. I did not consider the evidence as a whole is worth the expense of getting it. The only portions I objected to seeing published were portions of Ham's testimony."

The defendants next introduced in evidence the publication by the News of February 3, 1880, of the proceedings of the Odd Fellows' convention at Dallas, as follows: Giving the proceedings of that body, and stating among other details that T. L. Wren, Right Worthy Grand Senior Warden, was among the officers there present, and giving among the names of the grand officers elected for the year 1880, that of T. L. Wren as M. E. H. P.

The issues of the News, containing about two hundred pages of testimony before the committee, were in evidence.

The defendants introduced in evidence the numbers of the Galveston News containing publications of the land frauds committee, that being all the evidence published by the News. January 7, 1880, page 4, as follows:

"LAND FRAUDS.

"Testimony taken by the legislative committee. What the attorney-general and Senator Duncan, an ex-member of the land investigating committee, say of its publication;" followed by the letters of McCormick and Duncan, and the reporter's note and editor's heading, as follows:

"PORTION OF HAM'S EVIDENCE — THE ATTORNEY-GENERAL'S VIEWS.

"ATTORNEY-GENERAL's OFFICE, Austin, Dec. 20, 1879.
"Agent News, Austin:
"DEAR SIR — In regard to the publication you propose to make of the evidence taken before the legislative committee, I desire to say that no statement made by witnesses known to be guilty them-

selves, implicating those believed to be innocent — unless corroborated — ought to be published; neither must anything be published that might, by giving notice, defeat the ends of justice. I herewith hand you letter of Senator Duncan on this matter, and request that his wishes be followed. Respectfully, etc.,

"GEO. McCORMICK.

"WHAT SENATOR DUNCAN SAYS.

"LONGVIEW, TEXAS, November 27, 1879.
"*Hon. Geo. McCormick, Austin, Texas:*

"DEAR SIR — Your favor of the 24th received. The law being silent as to whether the evidence filed in your office by the committee shall be open to public inspection, I think, with you, that the state officers in charge of it should make such rules as to its inspection and publication as will be most conducive to the good of the public. I am certainly of the opinion that as far as practicable and expedient, the people should be placed in possession of the facts set forth in that testimony, believing it, if possible, more important that honest people be warned against men than against forged titles; for there is no sort of doubt that many of the thieves when arrested merely give bond which cannot be collected in case of forfeiture, and continue in business; however, I think two exceptions should be made.

"1. Of course, where the publication would give a criminal notice, and enable him to escape, it should not be made.

"2. I should much dislike for all the statements of Ham and others of his ilk, concerning Mr. Fisher, and perhaps some other gentlemen, who, by a vigorous prosecution, made themselves obnoxious to the rogues, to be published, for the reason that no sort of credence was given them by the committee, and the proof of their falsity in some instances not having been reduced to writing, though by the committee considered ample, it would unnecessarily be giving these gentlemen a public reputation and explanation. These of course I give as suggestions for what they are worth, but I believe I speak the opinion of the whole committee.

"Very respectfully,
"JOHN M. DUNCAN.

"REPORTER'S NOTE.

"NOTE. — Attorney-General McCormick tells me that he puts no stress upon the idea that publication of evidence will in any case defeat the ends of justice; but he urges me to state to you that

when Ham, and others convicted, made unsupported charges against Fisher, and others who have been instrumental in their conviction, it is neither fair nor justifiable, and that their statements cannot be considered evidence before a legislative committee. He thinks, with Senator Duncan, that the principal benefit to be derived from the legislative committee's work is the publication of the testimony; but holds that where it is evident the malice of the convict against his accuser suggests his testimony, it is not fair nor just to publish it.— News Reporter.

"EDITOR'S HEADING.

" The statement was made by Ham before the committee appointed and acting during the regular session of the legislature; and while his appeal was pending in the court of appeals Ham claimed that he made a similar statement in writing to the governor. The testimony at large is very voluminous as well as diversified. Though the charges made by Ham and other convicted parties are not verified by the investigation, they are of the records of the sixteenth legislature and belong to the public. They will, therefore, be given to the public in the order in which they were received by two successive legislative committees; since to suppress this part of the testimony, even out of consideration for innocent and irreproachable parties, might seem unwarrantably partial and biased rather than judicial and just.

" [Copied from the record of the official proceedings on file in the office of the attorney-general at the capitol. W. M. O'Leary, official stenographer for the committee on land forgeries.]

" None of the above being any portion of the testimony taken before or of the proceedings of the committee."

Then followed a portion of the testimony of J. R. Ham before the committee, the whole occupying two and one-half columns of the fourth page.

In the issue of January 23, 1880, of the Galveston Daily News, was found the following:

"LAND FRAUDS — TESTIMONY TAKEN BY THE LEGISLATIVE COMMITTEE.

" [Copied from the record of the official proceedings on file in the office of the attorney-general at the capitol. W. M. O'Leary, official stenographer for the committee on land forgeries.]

"JESSE STANCEL.

" I knew Tullis in Galveston. I knew him here; boarded with him in 1875, or in the same house with him. I know very little

facts of what he was doing. I have, however, some little information of a transaction of his with a gentleman named Wren, I think, in the summer of 1875. Tullis and Wren were friends, together all the time. I will state the details so far as I know: In the summer of 1875, in July or August, Wren went away from here. I saw him and Tullis going to the Central depot together, and I was satisfied from intimations of Tullis that he was going away to fix up some crooked papers. He was gone about ten days. He came back here, and the same evening after he came back I met him and Dr. Tullis, and one or two others, on the corner talking. He (Wren) was sporting a very fine suit of clothes, and he said he bought them in St. Louis. Some months after that I met Dr. Tullis in the land office. He was looking on the map of Erath county. He pointed out to me a piece of land in the north part of the county, of which I think he said Pace was the grantee; but I am not certain about it. I think it was a league survey; and he remarked that Wren had bought it during his trip, and they (Tullis and Wren) had sold enough to pay the purchase money and what other expenses they had been to. Dougherty, Connelly and Ammerman, of Dallas, were the agents for the sale. Some time after that there were some parties making mention to Wren about his having obtained that survey so easily. He said he went to Mississippi and bought it from the heirs. I do not know anything about the papers; my impression is that they were made by himself. From a good many intimations I am satisfied that Wren and Tullis were working together.

"Q. Where is Wren now?

"A. I suppose he is in Austin. I do not know Wren's initials. He is a young man. I would know him if I saw him. His occupation was that of a land agent — rather in a quiet way."

A vast amount of testimony before the committee, composed of members of the legislature, to investigate land frauds in vacation, was offered in evidence, the same having been published in the News, and was offered by defendants.

There was no effort made by defendants to show the truth of the charges contained in the published testimony, and which was the basis of the suit.

The charge of the court was as follows:

"The plaintiff avers in his petition that the matters and things contained in the publication complained of and set out in his petition imputed to him the crime of forgery; that the words used were understood as charging the plaintiff and did charge this plaintiff with the crime of forgery. If you shall find from the evidence

that the words complained of referred to this plaintiff, and that they imputed to him and charge him with the crime of forgery, and that the same was published by defendants in this county, then I charge you that plaintiff is *prima facie* entitled to recover without any proof of special damage.

" When I say *prima facie* entitled to recover, I mean he is entitled so to recover, unless something has been shown which repels that presumption.

" In regard to what will constitute a publishing, the law of libel is that the publication is made wherever the matter is made known and communicated; and if you find that the paper called the Galveston Daily News was edited, printed and sent out to their subscribers through the mails, to be delivered through the postoffice at Austin, to subscribers here by due course of mail; and that the said paper was so sent by defendants, or by their procurement, to this county, to be read and circulated by the people of this county ; and that the paper containing said article was so by them sent to this county to be read by its subscribers generally and for general circulation here, and it was so and by that means read and circulated in Travis county; therefore, for the purposes of this trial, the said matter, statements, etc., was, as to this plaintiff, published in Travis county.

" Defendants deny that they published the said matters in this county; and if, under the instructions given you above, as to what will constitute publication as applied to the law of libel, you do not find that defendants did publish said statement in this county, then you will find for the defendants generally.

" As stated, defendants deny that they published said alleged libelous matter in this county; but say, if they did, that the same was a privileged publication, because the same matters and things are found in the report and proceedings of a committee of the legislature, and is in fact and in truth a legislative proceeding; and further, that the same is in the nature of a judicial proceeding and therefore privileged.

" It becomes, therefore, my duty to instruct you as to what are privileged publications. In regard to the legislature, the constitution provides that the journals of each house shall contain the proceedings of each house, viz., the senate and house of representatives; and anything found upon the journals of either house would be a privileged publication. The joint resolution of April 26, 1879, does not provide for any report to the legislature of their actions and doings; nor is there any evidence that their proceedings, embracing the matters specially complained of, are incorporated into the jour-

nals of either house as the evidence before them; and, therefore, I charge you that the matters and things as alleged do not, strictly speaking, constitute proceedings of the legislature so as to come under the unqualified privilege claimed for it. Neither was such committee such a court of justice as that its proceedings were necessarily such as can be called unqualified privileged publications. The constitution requires the proceedings of the legislature shall be public when it says: ' The sessions of each house shall be open, except the senate when in executive session;' and the constitution further provides that 'all courts shall be open.' And in order to be what is termed a privileged publication, because the same recites the proceedings of a court, the court must be public [and the] proceeding in open court. The idea being that the legislative proceedings are open and public to those who may desire to be present, and so also of courts; and what is proper for some to see and know, it can be no harm, legally, for everybody to know and hear; and, therefore, may be published with impunity — public good demands and public justice requires it.

" If you shall find from the evidence, therefore, that the committee of the legislature sat with closed doors and in secret session, and not open to the public, then I charge you that defendants cannot protect themselves against all liability on the plea of privileged publication, because a legislative proceeding. And in that event, if you shall find defendants did make the publication as alleged, and that the same contains and asserts that the plaintiff was and is guilty of the crime of forgery, then plaintiff would be entitled to recover the damages by him sustained, as compensation for actual damages. It is pleaded that the matters complained of had been made public before they printed the said report; that it was filed in the attorney-general's office and that they procured the same from him. The resolution above referred to did provide that the testimony taken by said committee might be filed in the office of the attorney-general. The statute requires the attorney-general to furnish any person who may apply for the same with a copy of any paper, document or record in his office.

" This statute, while it imposes upon the attorney-general a duty and authorizes any one to call for a copy of any paper or document in his office, does not authorize any one to publish matter that it would be illegal to publish if obtained from another source. Still I feel it proper to say that it is a matter that the jury should consider in reference to the amount of damages, in case of any recovery at all, as well as considering the question of malice; and upon the

question of malice all the evidence adduced by defendants tending to show that they were not actuated thereby must be considered.

"Defendants plead, in addition to this plea, that it is and was a privileged publication; that the same is a full and correct copy of the evidence and proceedings before said committee; and, therefore, they are not liable. When a proceeding or report is printed and published, containing defamatory matter, it is necessary that the same should not only appear to be a privileged publication, in order to avoid responsibility, but it must be a true, full and complete copy of all of such evidence, report or proceedings, without criticism or unfavorable comment, so that if the matter would be privileged, if full and complete, it would not be a full answer if it appeared to be a portion only of such report, or proceeding or evidence; defendants further plead that the matters and things had been published and made known by others before the alleged publication of the matters and things complained of by them, and that they are therefore not liable if it shall be shown that they did publish the same. In regard to that plea, I charge you that every person who publishes defamatory matter, without other justification or excuse than that some one else has or had done the same thing before, is not an answer to the suit that will defeat entirely the cause of action.

" When a publication charges one with a crime punishable by statute in the penitentiary, the law gives a right of action and a right to recover something, unless the defendant can show one or both of two things; these things are: *First*, that the statements are true; and *second*, that the same are and were privileged publications.

" When neither of these defenses is established the law gives compensatory damages; for injuries actually sustained the law presumes nominal damages, and leaves it to the consideration of the jury what more, if any, shall be given as compensation for injury actually sustained. Malice is an important element entering into the question of the extent of the right of a party to recover; and the jury will look to all the evidence in order to ascertain whether the defendants were in fact actuated by a disposition to do the party an injury; if so, they would be authorized to give punitory damages, but if not they would not give damages beyond the injury sustained. The law only imputes sufficient malice from the defamatory charge to carry nominal damages when there is no justification, and leaves the rest, as to what the actual damages has been, to the sound discretion and judgment of the jury under the evidence upon that point.

"If you find for the defendant you will so say; if you find for the plaintiff, you will say how much."

The following charges were asked by defendant and refused:

"1. The defendants ask the court to charge the jury, that if you believe that the defendants are publishers of a newspaper published in Galveston in this state; and that there was no other publication of the alleged libel by them in Travis county than the mailing of their newspaper by them to news agents who sold them in Austin to their customers, or mailing them directly to their subscribers at Austin, and in Travis county, then I charge you that proof of these facts alone do not constitute a publication by the defendants of the alleged libel in Travis county as charged in the petition.

"2. Defendants ask the court to instruct the jury as follows: If you believe from the evidence that the alleged libelous matter published by the defendants constituted a part of the report or testimony deposited by a legislative committee of the sixteenth legislature in the office of the attorney-general, and that the same was published with substantial correctness and fairness and without any malice or improper motive and *bona fide*, then it is a privileged communication and the defendants are not liable.

"3. Defendants ask the court to charge the jury as follows: If you believe from the evidence that the alleged libelous matter constituted at and before the time of its publication a part of the public records of the attorney-general's office, and were open and accessible to all, then I charge you that if the publication of such matter was made *bona fide*, and with reasonable accuracy and without unfair comments, you will find for the defendants."

The following was given:

"4. Defendants ask the court to charge the jury as follows: In estimating the amount of special damage, if any, to be allowed to the plaintiff, you are to be governed alone by the evidence before you."

The first bill of exceptions related to the admission of evidence that the issue of the Galveston News of January 23, 1880, was sold in Travis county by newspaper dealers (which was proved); also to the examination of witnesses to prove damage to plaintiff's character (which was testified to), as a result of the publication; also to the admission of testimony to prove the secrecy with which the legislative committee conducted its examinations.

After the expiration of ten days from the day when the verdict was returned, another bill of exceptions was presented by defendants attempting to save exceptions to the action of the court in re-

fusing to permit Hamilton Stewart to state what had been the custom of the Galveston News in the last thirty years about publishing legislative proceedings, and about the prudence and caution exercised by its editors in such matters. This bill was not allowed because presented too late.

*Hancock & West*, for appellants, on jurisdiction, cited: Const. 1876, art. 5, sec. 8; art. 13, sec. 6; R. S. Tex., Civ. Stat., title 29 (Courts, etc.), ch. 4, art. 1198, paragraph 8 of said article, also paragraph 23; R. S. Tex., Penal Code, title 16, ch. 1, arts. 616, 620, 625, 626, 627, 636; R. S. Tex., Code Crim. Proc., title 4, ch. 2, art. 225; Linney v. Maton, 13 Tex., 454 (concluding paragraph on the page); Starkie on Slander, vol. 2 (Wendell's edition of 1852), top p. 39, marg. pp. 39, 40, 41, 42 (note A), on top pp. 40, 42, marg. pp. 41, 42, being a full report of Sir Francis Burdett's case on the question of publication, opinion of Bayley, J.; Townshend on Slander and Libel (3d ed., 1877), ch. 16, secs. 379 to 384; Archb. Crim. Plead. (Waterman's Notes), vol. 2, notes on pp. 322, 17, 322, 18 (6th ed., 1853). See, also, Rex v. Burdett, 4 B. & Ald., 126; Rex v. Johnson, 7 East, 65; 1 Hilliard on Torts, ch. 11, pp. 294 to 297 (ed. 1866); Folkard's Starkie on Slander (Am. Ed., 1877), sec. 542 to 547, 904, 920 to 923; Buell's Case, 3 Dillon, 116, 121, 124.

Appellants' counsel made the following proposition:

" The alleged libelous matter, constituting as it did a part of the testimony taken by a committee, composed of members of the house and senate of the sixteenth legislature, duly authorized by joint resolution to sit in vacation and take such testimony, and being by such committee lawfully deposited in the office of the attorney-general of the state, upon the completion of their labors and on their adjournment, and being so received by the attorney-general of the state as constituting a part of the public records of his office, became public papers, constituting a part of the official action of the sixteenth legislature, and forming a part of the public archives of the attorney-general's office, and as such they became public, all persons interested in them having the right, under proper restrictions (for the safety of the papers), to have access to their contents; and hence, if the appellants were in fact publishers of a daily and weekly newspaper, and obtained this information lawfully from the office of the attorney-general by his permission, after the adjournment of the committee, and published it with reasonable fairness and correctly, and from no improper motive, and without malice to the appellee, or any other person, then they are not civilly liable

for making such publication under such circumstances, if made in good faith."

In support of which they referred to the following authorities: Townshend on Slander and Libel (3d ed., 1877), §§ 120, 208, 209, 217, 219, and note 2; 229, 230, 231; pp. 409, 410; p. 409, note 4; Terry *v.* Fellows, 21 La. Ann., 375; Wason *v.* Walter, Law Rep., 4 Q. B., 73; McBee *v.* Fulton, 47 Md., 403; S. C., 28 American R., 465, and cases cited; Snyder *v.* Fulton, 34 Md., 128; S. C., 6 American R., 314; People *v.* Leonard, 5 Hun (N. Y.), 626; Usill *v.* Hales, 6 Central Law Jour.; Fisher's Dig. (1878), 116; White *v.* Nichols, 3 How. (U. S.), 266; Cooley on Const. Lim. (4th ed.), top page 550; marg. p. 441, note 1, and top page 551; also (same ed.), ch. 12, top page 560; marg. p. 452 *et seq.* to page 568; see also, 569, 571, 572, and cases referred to; Cosgrove *v.* The Trade Auxiliary Co., 8 Irish Reports, C. L., 349, Q. B.; Fisher's Digest of Eng. Rep. for 1874, "Defamation," p. 103; Gen. Laws 16th Leg., p. 194; Joint Res. passed 26th April, 1879; art. 3, sec. 16, art. 13, sec. 6, Const. of 1876; R. S., 2253 and 2795 *et seq.;* Barclay's Parliamentary Law (ed. of 1875), p. 61; (ed. of 1874), pp. 136 to 581; Folkard's ed. of Starkie, secs. 219 to 223, 227 to 246, 669; Gen. Laws of 1874, p. 243; Gen. Laws of 1875, p. 28; Gen. Laws 1876, pp. 59 and 252; Const. of 1876, art. 4, sec. 1; art. 1, sec. 8.

*Messrs. Ballinger & Mott*, also for appellants, filed an able and exhaustive printed argument in addition to the brief of associate counsel.

*Carleton & Morris*, for appellee, on the question of publication, cited: Townshend on Slander and Libel (3d ed.), secs. 93–104; Roscoe's Crim. Ev., 660; Starkie on Slander, vol. 2 (Wendell's ed.), top page 40, marg. 41; vol. 1, pp. 343, 344, 345; 2 Starkie on Ev., 852, 1114, 1115; Flood on Slander and Libel, pp. 275, 276; Hanks *v.* State, 13 Ct. App., 357; Huff *v.* Bennett, 4 Sandf., 120; Commonwealth *v.* Blanding, 3 Pick. (Mass.), 304; Layton *v.* Harris, 3 Harr. (Del.), 406; Warren *v.* Warren, 1 Cromp., M. & R., 250; Roscoe's Crim. Ev., 626; Schenck *v.* Schenck, 1 Spenc., 208; Wenman *v.* Ash, 13 Com. B., 836; Folkard's Starkie, secs. 397, 904.

As to whether the publication was privileged, they cited: Const. of Texas, art. 3, secs. 5, 10, 12, 16, 21, 24, 29, 30, 40, 56, 57; art. 2, sec. 1; art. 5, secs. 1, 7, 8, 10, 13, 15, 16, 17, 19; Code Crim. Pro., arts. 384, 400; Folkard's Starkie, marg. p. 273, note 1; Rev. Civ. Stat., arts. 65, 2253; H., T. & B. R. Co. *v.* Randolph, 24 Tex., 317;

Townshend on Libel and Slander, sec. 238a, p. 425; Cooley's Const. Lim., 4th ed., pp. 134, 78; top p. 110; marg. p. 91; top. pp. 126, 127, 211; marg. pp. 174, 175, 104, 105, and authorities there cited; 2 Addison on Torts, 337, sec. 1109; Hosemer v. Loveland, 19 Barb., 111; Lane v. Dorman, 4 Ill., 242; 3 Scammon (Ill.), 238; Thorn v. Blanchard, 5 John., 508; Howard v. Thompson, 21 Wend., 319; O'Danayhue v. McGovern, 23 Wend., 26; McGregor v. Thwaites, 4 D. & R., 695; 3 B. & C., 24; Fisher's Com. L. Dig., 3048; Joint Resolution No. 19, General Laws 1879, p. 194; Odgers on Slander and Libel, p. 260; Flood on Slan., etc., p. 193.

That the evidence published was taken in neither a legislative nor judicial proceeding, they cited: Const. U. S., 6th Amend.; Const. Tex., art. 1, secs. 3, 10, 17, 19; art. 3, sec. 16; Report of Legislative Committee on Land Forgeries, Journals Sixteenth Legislature; Joint Resolution No. 19, General Laws 1879, p. 194; 1 Starkie on Slander (Wendell's ed.), pp. 264–9; 1 Starkie on Slander, Preliminary Discourse, top pp. 75, 123; marg. pp. 85, 125, note d; Holt's Law of Libel, 172, 173, and note (Am. ed.); Cook's Law of Defamation, 45; Townshend on Libel and Slander (3d ed.), pp. 128–143, secs. 86, 87, 88, 90, 91, 92, 231, 252, 217–19, note, and sec. 229; Flood on Slander and Libel, p. 193; Cooley on Const. Lim. (4th ed.), top p. 560; marg. p. 449; top. pp. 559, 570; marg. 557, 558, 456; 1 Hilliard on Torts (3d ed.), ch. 14, sec. 8; 2 Addison on Torts, p. 336, and authorities there cited, sec. 1107; Cooley on Torts, 209; Albany Law Journal, May 21, 1881, vol. 23, p. 401; Report of Shanks v. American News Co. N. Y.; Folkard's Starkie, marg. p. 273, note 1; Stanley v. Webb, 4 Sandf. (N. Y.), 21; Cincinnati Gazette Co. v. Timberlake, 10 Ohio St., 548; Hotchkiss v. Oliphant, 2 Hill (N. Y.), 510; King v. Root, 4 Wend., 138; Sanford v. Bennett, 24 N. Y., 20; Fry v. Bennett, 5 Sandf., 54; Thompson v. Pawning, 15 Nev., 195, May 14, 1880; The Reporter, October 6, 1880, p. 436; Wilson v. Fitch, 41 Cal., 363; Matthews v. Beach, 5 Sandf., 256; McCabe v. Cauldwell, 18 Abb. Pr. R., 377; Dexter v. Spear, 4 Mass., 115; Duncan v. Thwaites, 3 B. & C., 556; 10 E. C. L.; Currie v. Walter, 1 B. & P., 523; Hoore v. Silverlock, 9 C. B., 20; Chorlton v. Walton, 6 C. & P., 385; Cox v. Freeng, 4 Fost. & F., 13; King v. Fisher, 2 Comt., 563; Parrett v. N. O. Times, 25 La. Ann., 170; Kelley v. Lafitte, 28 La. Ann., 435; King v. Lee, Esp., 193; Delegal v. Highly, 32 E. C. L., 435.

That if illegal to publish as coming from the committee, it was equally so when obtained from office of attorney-general, citing: Cooley on Const. Lim. (4th ed.), top p. 559, marg. 448; 1 Starkie on

Slander (Wend. ed.), Preliminary Discourse, top p. 74, marg. 85; 2 Addison on Torts, 334–6; Taylor *v.* Church, 8 N. Y., 452; Sunderlin *v.* Bradstreet, 46 N. Y., 188; Philadelphia, etc., R. R. *v.* Quigley, 21 How. (U. S.), 212; Flood on Slander and Libel, p. 193; De Crespigny *v.* Wellesly, 5 Bing., 392; or Bigelow, Lead. Cases, Torts, pp. 155–158; Beardsley *v.* Tappan, 5 Blatch., 497; Lake *v.* King, 1 Saund., 131; Flint *v.* Pike, 4 B. & C., 473; Railroad *v.* Lord Abingdon, 1 Esp. C., 226; Stockdale *v.* Howard, 9 Ad. & Ell., 1; 26 Law J., Q. B., 107; 7 Ell. & Bl., 233.

WILLIE, CHIEF JUSTICE.— Two important points demand our consideration in determining the present appeal:

1. Did the district court of Travis county have jurisdiction of the cause?

2. Was the alleged libelous matter of a privileged character?

1. The defendants below all resided in Galveston county. The Galveston Daily News, in which the alleged libel appeared, was issued from the press in that county and to subscribers living there. It had subscribers in the county of Travis to whom it was regularly mailed and delivered, and it was also sold by news agents in that county.

The number in which the alleged libel appeared was mailed from the Galveston office of publication to its subscribers and the news agents in Travis county, and was read by such subscribers, and by persons who bought it from the news agents.

It is claimed by the appellants that, being residents of Galveston county, and because the paper was issued from the press at Galveston, has its office there, and is mailed there to subscribers in other counties, that county alone has jurisdiction of the cause.

The general rule is that every person against whom an action is brought must be sued in the county of his residence. Among other exceptions is the following: "Where the foundation of the suit is some crime, or offense, or trespass for which a civil action in damages may lie, in which case the suit may be brought in the county where such crime, or offense, or trespass was committed, or in the county where the defendant has his domicile." R. S., art. 1198, ex. 8.

By our criminal code, libel is declared an offense punishable by fine or imprisonment. Crim. Code, art. 617.

It may be committed by either making, writing, printing, publishing, selling or circulating the malicious statement with intent to injure another. By reference to arts. 619, 620 and 621, it will be

seen that three distinct methods by which the offense may be committed are pointed out and defined. It will not be necessary for us to compare these definitions with those which are given by the common law. It is sufficient to say that within the meaning of *publishing* and *circulating* a libel are at least contained all acts going to make up the offense of publishing a libel, as known to the laws of England and of our sister states. No doubt can arise upon the proof or pleadings in this case but that the appellants sold and distributed the copy of their paper which contained the alleged malicious statement. Such sale and distribution constituted *publication* at common law; it constitutes *circulation* under our penal code. As under the former, publication of a libel was an offense indictable wherever it occurred, so, under our law, *circulation* of a libel is an offense committed in any place where the libel is sold or distributed. 1 Bish. Cr. Proc., §§ 53, 57, 61; Com. v. Blanding, 3 Pick., 304; Rex v. Gridwood, 1 Leach, 142; Rex v. Burdett, 4 Barn. & Ald., 95; Penal Code, arts. 616–621.

The fact that the crime of libel may have been completed by a publication of the paper in Galveston county does not make it any less a crime to circulate the number containing the alleged libelous article in other places. By the common law the sale of each copy is a distinct publication (Odgers on Lib., 532), and hence a distinct offense, and the prosecutor may at least choose for which of the distinct offenses he will call the guilty party to account. A copy of the paper may be first sold to A, then one to B, and another to C; but because the publication is completed by selling to A, the government is not bound to select that particular fact as the one upon which it will rely to prove the completion of the offense. It may indict for either of the sales, and as it makes no difference which was first in point of time, so, for the same reason, it is unimportant in what place the publication first took place. These principles are so well grounded in the law of libel, that they would not have been noticed at such length but for the zeal and earnestness with which distinguished counsel have urged upon the court a contrary doctrine. Under our penal code each act of either making, publishing or circulating a libel being a separate offense, we must hold that the circulation of the "News" containing the libelous statement in Travis county was such an offense, no matter what may have been done with reference to it in the county of Galveston. The offense having been committed in Travis county, and being indictable there, the present civil action for damages was properly brought in that county.

2. The question as to whether or not the alleged libelous publication was privileged matter depends upon the particular facts proven upon the trial below. To these facts alone our decision is confined, as we do not propose to fetter our judgment so that it may not be freely exercised in any future case presenting a different state of circumstances.

We first briefly consider the law which, in our opinion, governs the case. If the publication was privileged at all, it was a conditional or qualified and not an absolute privilege. The publisher of defamatory matter is exempted from responsibility in such cases, because the demands of public policy for the publication outweigh all considerations requiring the protection of private reputation in the particular case.

The public are not regarded as having such an interest in proceedings embodying defamatory matter as will outweigh the necessity of protecting the character of individuals, unless they are proceedings of a legislative or judicial character. Cooley's Const. Law, 568; Townshend on Libel, 411; Sanford v. Bennett, 24 N. Y., 20.

This rule includes within itself proceedings of a *quasi* judicial character, *i. e.*, before a body having the power to hear and determine matters submitted to its jurisdiction by the voluntary consent of its members. Cooley on Const. Lim., 448, and notes.

It is only on account of this judicial character that its proceedings are protected, and to give it such character it must have authority, not only to hear but to decide the matters coming before it, or to redress grievances of which it takes cognizance. Barrows v. Bell, 7 Gray, 301.

But to be privileged the proceeding must have been not only judicial or legislative, but it must not have been preliminary, *ex parte* and secretly conducted. Flood on Libel, 244; Townshend on Libel, § 231; McCabe v. Cauldwell, 18 Abb. Pr., 377; McBee v. Fulton, 47 Md., 403.

There may be cases where a preliminary and *ex parte* proceeding would be privileged, but as to this we do not decide; but when to these two conditions is added the fact that the proceeding is conducted in secret, we know of no principle in the law of libel that will protect the publication.

*Ex parte* proceedings have been held privileged where there was a right in the accused to appear and defend himself. If privileged where this was not the case it was on the ground that they were open and might be attended by the public, and that their publication was therefore merely an enlargement of the area which a knowledge of the proceedings would otherwise extend.

But if merely preliminary, and at the same time *ex parte* and secret, no policy of the law can be subserved by their publication which is not overborne by the damage which may result to the reputation of individuals. The accused may escape by reason of having publicity given to the preliminary proceedings upon which his prosecution is to be based. A person may have his case prejudged, and himself so far found guilty in public opinion as to deprive him of a future fair and impartial trial, without any opportunity of defending himself in the preliminary proceedings; or he may have his character traduced without the slightest intimation that it will be the subject of investigation or discussion. It is true that the same thing may happen in a public trial, but what occurs there is open to the world; and what the public are entitled to witness may in many instances be disclosed to it through other channels. Even this, however, is not a universal rule, as there are cases where defamatory matter may be spoken in privileged places, when its publication at other places would constitute libel. Cooley, Const. Lim., 457 *et seq.;* Townshend on Libel, § 219, and notes. This is always the case when the proceeding in which it is uttered is of a secret character. Flood on Libel, 193, 194.

We think the privilege of publishing defamatory matter is confined strictly to proceedings of a judicial or *quasi* judicial or legislative nature, and, if preliminary and *ex parte*, they must at least be openly conducted and subject to the inspection of the public. This is as far as it is necessary for us to go in the case now under consideration, to which case let us apply the principles above announced.

The joint committee appointed by the legislature of Texas, before whom the defamatory words published by the appellants were spoken, was not a body possessing either judicial or *quasi* judicial powers. It determined nothing; exercised its judgment upon no question requiring judicial action; did not even procure evidence which could be recognized in a court of justice for any purpose whatever. It simply obtained the statements of witnesses under oath, to be used, not in a court of justice, but as a guide to attorneys representing the state in bringing offenders against her criminal laws to justice.

Nor can its proceedings in strictness be termed legislative. The committee was appointed by the legislature and was composed of members of that body; but it was to do nothing in aid of legislation—it was not even to report anything for legislative action. The duties required of it, and the powers granted it, could as well

have been discharged and exercised by persons not connected in any manner with the legislature. The result of its labors was never necessarily to come to the knowledge of that body, nor to form part of its records in any manner whatever. They were an irregular and irresponsible committee, exercising doubtful powers, and formed for no purpose connected with the duties of the body from whom they derived their appointment. It would seem, therefore, rather a stretch of the meaning of the term "legislative" to apply it to the proceedings of such a committee.

But admitting that they were legislative or judicial, or both, what was the object of their proceedings and how were they conducted? Their object was to obtain evidence by which the state's counsel might be guided in instituting criminal prosecutions against the perpetrators of land frauds and forgeries. The proceedings of the committee did not rise to the dignity of those of a grand jury or of a justice of the peace making a preliminary examination. These are filed in courts, and upon them a *capias* may issue and the offender be arrested and thrown into prison. Upon the action of this committee no such criminal process could be founded, and a seizure of any person under a writ issued as one of the results of their proceedings would only have laid the basis for an action of false imprisonment. So far from ever becoming part of the records of a court, the purposes of the committee's formation were fully satisfied if the evidence procured by them was placed in the hands of any attorney employed by the state to prosecute land frauds and forgeries. Its proceedings, therefore, have not the slightest imaginable claim to being called even a preliminary examination, in the legal sense of that term.

Moreover these proceedings were in their very nature essentially *ex parte*,— so designed to be by the resolution creating the committee, and such was the practical construction given to them by the committee itself. No party whose connection with land frauds was inquired into was ever allowed to appear before it, and produce witnesses in rebuttal of the evidence adduced against himself. The inquisition was established for the purposes of prosecution only; any defense the accused might have was reserved for the trial of the cause, when he was brought before the courts to answer the prosecution based upon the committee's evidence.

Again, the proceedings were secret — carried on with closed doors, and in the presence only of the committee, their clerk and persons interested solely in the prosecution of the frauds developed by the evidence. There may have been occasionally two witnesses in the

room at one time, but this was an exceptional case and did not deprive the proceedings of their general secret character.

It was obviously necessary that the proceedings should be kept secret, otherwise offenders having notice of the evidence given against them would place themselves beyond the reach of the law. It was proper, too, in order to prevent innocent persons, against whom perjured witnesses might bring accusations, from suffering in reputation and in the good opinion of the public.

The fact that the evidence taken before the committee might be filed in the attorney-general's office does not affect the question. The joint resolution would have been satisfied if this evidence had been committed to the state's private counsel alone. This shows that it was not intended to be made an archive of a public office; but, taken in connection with the purposes for which the committee were appointed, clearly shows that its contents were to rest within the knowledge of the state's chosen prosecuting officers, to be withheld by them from the public until the parties implicated in land frauds by the evidence should be placed within the grasp of the criminal law. The attorney-general is the state's counsel, made so by law. Confidential communications between himself and his client, and papers committed to his inspection in reference to prosecutions like the present, must not be divulged before the prosecutions have been commenced or abandoned; otherwise the whole object of the proceeding would be thwarted.

We do not think that it was his duty — not even his privilege — to give copies of the evidence to persons requesting them of him. This might end in giving information to the accused, such as it was never intended he should receive in advance of his arrest or indictment. If the contents of the evidence could not be made known to a few, through copies taken from the attorney-general's office, it certainly could not be published to the world through the newspapers. The plastic nature of the common law does not allow us, in deference to the improvements of modern times, and the advance of newspaper enterprise, to so vary the cardinal principles of the law of libel that proceedings required by the policy of the law to be kept absolutely secret may be published to the world in the columns of a newspaper. We cannot defeat the ends of justice, and the objects of the criminal law, for the purpose merely of satisfying the public craving for news and information.

Every facility should be allowed for the quick dissemination of useful facts, and the freedom of the press should not be restrained further than is absolutely necessary to protect private character

from falsehood and slander. But public policy alone protects de-
famatory statements made through the press, and they cannot be
shielded when made in defiance of one of the plainest principles of
law established solely for the public benefit. We therefore con-
clude that the defamatory matter complained of by the appellee,
and proven to have been published by the appellants, was not of a
privileged nature.

We are cited to some authorities supposed to hold a contrary doc-
trine to what we have above decided. We do not so understand
them. The case of McBee *v.* Fulton, 47 Md., 403, was not a case of
a preliminary *ex parte* proceeding, and the decision is not authority
for such a case. Besides the decision itself is not only consistent
with our views as to secret proceedings, but apparently recognizes
that in such cases the rule as to privilege does not apply.

In Terry *v.* Fellows, 21 La. Ann., 375, it is not made to appear
that the proceedings were *ex parte*, or that they were conducted in
secret; and it is a fair inference that the action of the committee
was intended to be reported to congress as a basis of legislative
action on their part. The case is clearly not in point. The case of
Kane *v.* Mulvany (2 Ir. R. C. L., 402) seems to have grown out of
the publication of matters occurring before a committee of the house
of lords. We are not informed as to how those proceedings were
conducted; whether *ex parte* and secretly, or otherwise; but we are
told that the decision was placed upon the ground that the commit-
tee had judicial powers, which destroys its applicability to the pres-
ent case.

We see nothing in this case not in accord with our present de-
cision. If they did so hold, we should not hesitate still to adhere to
the doctrines announced by us, as they are in harmony with the
great weight of American and English authority, and supported by
the views of the most eminent of text-writers upon the subject of
libel.

But admitting that the defamatory matter was privileged, did the
appellants make a fair, just and full report of all that occurred
during the committee's investigation which would have affected the
belief of the public as to the guilt or innocence of the appellee of
the charges made against him by Stancel? It appears that much of
the testimony was not reduced to writing and hence not published.
Still it was part of the proceedings before the committee. It is
hardly an excuse for the appellants that they could not obtain this
testimony if it contained facts favorable to Wren; and if it did not,
they should have shown it, or stated that it could·not be procured

in connection with the publication of the other facts. The letter of the attorney-general accompanying the evidence of Stancel forbade the publication of any statement made by a witness known to be guilty himself, implicating another believed to be innocent. The publication of this letter along with Stancel's evidence as to Wren was equivalent to a declaration of the appellants either that Stancel was not known to be guilty, or that Wren was not believed to be innocent, either of which, if believed, gave to the defamatory matter an appearance of truth.

It also appears from the letter of Senator Duncan that he preferred that the statements of Ham and others casting reflections upon Mr. Fisher and other persons interested in the prosecution should not be published. This was a mere suggestion, and not an absolute denial of the right to report such statements. It was nothing more than proper, under the circumstances, that the appellants should have shown to the public that the false statements concerning these persons were not made by Stancel, if such was the truth. No one can tell from reading Stancel's evidence whether or not he defamed Mr. Fisher and other prosecutors. If he did, the "News" should have so stated, and thus weakened the force of his testimony as to Wren. Whilst we do not hold that the permission of the attorney-general, or of a member of the committee, justified the publication, yet, if offered as such justification, it must not appear that the letters granting the permission have been used so as to add force to defamatory matter contained in the evidence. It may be added that the joint resolution having required that an abstract of the land titles affected by the forgeries should be filed in the land office, it was nothing more than just that the appellants should have made it known to the public that the titles which Stancel had sworn were forged by Wren did not appear from the abstract to have been tainted with any fraud committed by him.

There are other questions raised in the record, but they are of minor importance, and some of them do not appear to be presented by proper assignments of error. The objection that the court did not direct the jury to separate the actual from the vindictive damages cannot be taken for the first time in this court. The court should have been asked to submit a charge directing the jury to separate the one of those classes of damages from the other. I. & G. N. R'y Co. v. Smith, decided at present term. The amount of damages in a libel suit is left largely to the discretion of the jury. They may take into consideration the motives of the publisher; and if the libel has been sold to the public indiscriminately, heavier dam-

ages are given, and evidence as to the mode and extent of the publication is at all times admissible. Town. on Lib., § 293; Odgers on Lib., p. 298. "Where the actionable words are spoken within the scope of a private jurisdiction, the declaration may allege a consequential loss of customers at a place beyond the limits of such jurisdiction." 1 Starkie on Slander, pp. 442, 443. All allegations as to damage to appellee outside of Travis county are but matters in aggravation of the general damages he was entitled to recover without proof of any loss sustained by reason of the slanderous publication. The refusal of the court to sign the bill of exceptions taken to the exclusion of Stewart's testimony is not ground for a reversal of the judgment, because, had the appellants received the full benefit of the exceptions, it would not have availed them, the court having correctly excluded the testimony. The pleadings of appellee do allege that the evidence was taken by the committee in secret session, and hence the third proposition of appellants under the tenth assignment of error cannot be sustained.

The other points presented by the record are not deemed of sufficient importance to require our attention.

There is no error in the judgment, and it is affirmed.

AFFIRMED.*

[Opinion delivered December 19, 1884.]

Associate Justice WEST did not sit in this case.

* This case is published out of its order on account of the pendency of a motion for rehearing.